Jennifer GRATZ and Patrick Hamacher, for themselves and all others similarly situated, Plaintiffs,

v.

Lee BOLLINGER, James J. Duderstadt, the Board of Regents of the University of Michigan, Defendants,

and

Ebony Patterson, Ruben Martinez, Laurent Crenshaw, Karla R. Williams, Larry Brown, Tiffany Hall, Kristen M.J. Harris, Michael Smith, Khyla Craine, Nyah Carmichael, Shanna Dubose, Ebony Davis, Nicole Brewer, Karla Harlin, Brian Harris, Katrina Gipson, Candice B.N. Reynolds, by and through their parents or guardians, Denise Patterson, Moise Martinez, Larry Crenshaw, Harry J. Williams, Patricia Swan–Brown, Karen A. McDonald, Linda A. Harris, Deanna A. Smith, Alice Brennan, Ivy Rene Charmichael, Sarah L. Dubose, Inger Davis, Barbara Dawson, Roy D. Harlin, Wyatt G. Harris, George C. Gipson, Shawn R. Reynolds, and Citizens for Affirmative Action's Preservation, Defendant–Intervenors.

No. 97–CV–75231–DT.

United States District Court, E.D. Michigan, Southern Division.

Feb. 26, 2001.

Kerry L. Morgan, Pentiuk & Couvreur,
Taylor, MI, Kirk O. Kolbo, David F. Herr,

Maslon, Edelman, Borman & Brand, Minneapolis, MN, Godfrey J. Dillard, Detroit, MI, for plaintiffs.

Philip J. Kessler, Okemos, MI, John A. Payton, Jane Sherburne, Wilmer, Cutler & Pickering, Washington, D.C., Leonard M. Niehoff, Butzel & Long, Ann Arbor, MI, Richard A. Wilhelm, Dickinson Wright, Detroit, MI, Susan I. Leffler, Michigan Department of Attorney General, Habeas Corpus Division, Lansing, MI, Kenneth S. Geller, Mayer Brown & Platt, Washington, D.C., Jeffrey S. Silver, Ann Arbor, MI, for Defendants.

### *OPINION*

DUGGAN, District Judge.

On October 14, 1997, Plaintiffs filed a class action against the University of Michigan and various University officials asserting that the University had violated Title VI of the Civil Rights Act, as well as the Equal Protection Clause of the Fourteenth Amendment, by considering race as a factor in admissions decisions at its College of Literature, Science, and the Arts ("LSA"). On December 13, 2000, this Court issued an Opinion addressing only the University Defendants' arguments that the LSA's admissions programs pass constitutional muster as a narrowly tailored means of achieving diversity, *see Gratz v. Bollinger*, 122 F.Supp.2d 811 (E.D.Mich. 2000), reserving Defendant–Intervenors' argument that the LSA's admissions programs pass constitutional muster as narrowly tailored means of remedying past and current discrimination by the University for later consideration. This Opinion shall address the Defendant–Intervenors' arguments.

### *Discussion*

■ As explained in the Court's prior Opinion in this matter, racial classifications are subject to the strictest of scrutiny, under which "such classifications are constitutional only if they are narrowly tailored measures that further compelling governmental interests." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227, 115 S.Ct. 2097, 2113, 132 L.Ed.2d 158 (1995). In opposition to Plaintiffs' motion for summary judgment, Defendant–Intervenors contend that the LSA's admissions programs "serve[ ] the uncontroverted compelling interest in remedying LS & A's past and current discrimination against minorities." (Def.–Intervenors' Resp. Pls.' Renewed Mot. Summ. J. at 2–3). In particular, Defendant–Intervenors contend that the University's race-conscious admissions policies serve to "remedy the present effects of discrimination that it has caused or tolerated; remedy the negative racial climate that it has sustained or that has been caused by others on the campus; and, remedy or off-set the effects of any current discrimination in which it is engaged." (*Id.* at 5).

■ In a proper case, racial classifications may be justified by a State's interest in remedying the effects of past or present "identified" discrimination. *Shaw v. Hunt*, 517 U.S. 899, 909, 116 S.Ct. 1894, 1902, 135 L.Ed.2d 207 (1996) (citing *Croson*, 488 U.S. at 498–506, 109 S.Ct. at 724–28, 102 L.Ed.2d 854). To rise to the level of "compelling," however, such an interest must meet two conditions. "First, the discrimination must be 'identified discrimination.' "[1] *Id.* (citing *Croson*, 488 U.S. at

---

1. Defendant–Intervenors assert that "courts have been more tolerant of race-conscious action taken to remedy race-based denial of educational opportunity" and have stated that

"race-conscious steps to ensure equal educational opportunity for minorities may be constitutionally permitted *even in the absence of particular identified discrimination.*"

499, 500, 505, 507, 509, 109 S.Ct. at 724–25, 725, 728, 729, 730). While states and their subdivisions may take remedial action when they possess evidence of past or present discrimination, " 'they must identify that discrimination, public or private, with some specificity before they may use race-conscious relief.' " *Id.* (quoting *Croson,* 488 U.S. at 504, 109 S.Ct. at 727). "Second, the institution that makes the racial distinction must have had a 'strong basis in evidence' to conclude that remedial action was necessary, 'before it embarks on an affirmative-action program.' " *Id.* at 910, 116 S.Ct. at 1903 (quoting *Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 277, 106 S.Ct. 1842, 1848, 90 L.Ed.2d 260 (1986) (plurality opinion) (emphasis added)).

■ "A generalized assertion of past discrimination in a particular industry or region is not adequate because it 'provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy.' " *Id.* at 909, 116 S.Ct. at 1902–03 (quoting *Croson,* 488 U.S. at 498, 109 S.Ct. at 724 (O'Connor, J.)). For this reason, the Supreme Court has repeatedly stated that "an effort to alleviate the effects of societal discrimination is not a compelling interest." *Id.* at 909–10, 116 S.Ct. at 1903 (citing *Wygant,* 476 U.S. at 274–75, 276, 288, 106 S.Ct. at 1847–48, 1854).

■ When the race-based classifications of an affirmative action plan are challenged, "the proponents of the plan have the burden of coming forward with evidence providing a firm basis for inferring

that the ... identified discrimination in fact exists or existed and that the race-based classifications are necessary to remedy the effects of the identified discrimination." *Contractors Ass'n of E. Pa. v. Philadelphia,* 91 F.3d 586, 597 (3d Cir.1996); *see also Concrete Works of Colo. v. Denver,* 36 F.3d 1513, 1521–23 (10th Cir.1994). Once this burden of production has been met, "the opponents of the program must be permitted to attack the tendered evidence and offer evidence of their own tending to show that the identified discrimination did or does not exist and/or that the means chosen as a remedy do not 'fit' the identified discrimination." *Id.* Ultimately, the plaintiffs challenging the program retain the burden of persuading the court that a violation of the Equal Protection Clause has occurred by either persuading the court that the race-based preferences were not intended to serve the asserted compelling interest, or that there is no strong basis in the evidence as a whole to support the defendant's conclusion that the identified discrimination actually existed, or that the continuing effects of such discrimination necessitated the chosen remedy. *Id.*

The significance of the burden of persuasion differs depending upon which path the plaintiff chooses to pursue. If the plaintiff's theory is that the race-based preferences were adopted with an intent unrelated to remedying past discrimination, "the plaintiff has the burden of convincing the court that the identified remedial motivation is a pretext and that the real motivation was something else." *Id.*

(Def.–Intervenors' Resp. Pls.' Mot. at 4–5) (emphasis added). Each of the cases cited by Defendant–Intervenors, however, involved voluntary desegregation plans designed to eliminate the vestiges of past *de jure* or *de facto* segregation in the educational context. Defendant–Intervenors have provided no evidence that the State of Michigan ever maintained a segregated higher education system, or that the admissions policies at issue were designed as voluntary plans to integrate its higher education system. Therefore, the Court is satisfied that Defendant–Intervenors must present evidence of particular identified discrimination.

"The ultimate issue under this theory is one of fact, and the burden of persuasion on that ultimate issue can be very important." *Id.* at 597–98.

When the plaintiff proceeds under the theory that, "although the [defendant] may have been thinking of past discrimination and a remedy therefor, its conclusions with respect to the existence of discrimination and the necessity of the remedy chosen have no strong basis in evidence," the plaintiff bears the burden of persuading the court that the facts alleged as support for the defendant's conclusions are not accurate. *Id.* at 598. Under this approach, "[t]he ultimate issue as to whether a strong basis in evidence exists is an issue of law" and, therefore, "[t]he burden of persuasion in the traditional sense plays no role in the court's resolution of that ultimate issue." *Id.*

■ Defendant–Intervenors assert that the University's race-conscious admissions policies serve to "(1) remedy the present effects of practices of LS & A that have served to exclude African Americans and Latinos from enrollment, (2) provide a critical mass of students to remedy LS & A's hostile racial climate, and (3) remedy the discriminatory effects of LS & A's current admissions criterion." (Def.–Intervenors' Resp. Pls.' Renewed Mot. Summ. J. at 7).

### 1. The "Actual" Purpose Behind the LSA's Race–Conscious Admissions Programs

Plaintiffs initially assert that the Court should reject Defendant–Intervenors' arguments because it is clear from the University Defendants' extensive briefing on this issue that the "actual purpose" behind the University's race-conscious admissions policies was not to remedy past or present discrimination, but rather, to achieve "diversity." (Pls.' 8/24/00 Br. at 2–7). According to Plaintiffs, "neither the Universi-ty nor the intervenors even pretend that the University was actually motivated by the interests that intervenors ask this Court to consider. The remedial justifications are just rationales that the intervenors believe the University *might have* chosen to adopt to justify their discriminatory admissions policies." (*Id.* at 5) (emphasis in original).

The Supreme Court has cautioned that when engaging in an Equal Protection analysis, the Court must look behind a defendant's "articulated" reason to determine whether there is sufficient evidence to conclude that the "articulated" reason is genuine, *i.e.*, that the articulated reason actually motivated the race-conscious program or policy. *See, e.g., Shaw,* 517 U.S. at 910, 116 S.Ct. at 1902; *Mississippi Univ. for Women v. Hogan,* 458 U.S. 718, 728, 102 S.Ct. 3331, 3338, 73 L.Ed.2d 1090 (1982). When conducting such an inquiry, the Court does not look behind the "articulated" interest to decipher for itself whether there were other justifiable reasons that may have supported the race-conscious program. "[A] racial classification cannot withstand strict scrutiny based upon what 'may have motivated the [State].'" *Shaw,* 517 U.S. at 908 n. 4, 116 S.Ct. at 1902 n. 4. The state actor must show that the alleged *objective* was the "actual purpose" for the discriminatory classification. *Id.*

In allowing Defendant–Intervenors to join this action, the Sixth Circuit found it persuasive "that the University is unlikely to present evidence of past discrimination by the University itself or of the disparate impact of some current admissions criteria, and that these may be important and relevant factors in determining the legality of a race-conscious admissions policy." *Grutter v. Bollinger,* 188 F.3d 394, 398 (6th Cir.1999). The Court shall interpret the Sixth Circuit's statement as an indication that although the University Defendants

have never claimed that the LSA's race-conscious admissions programs were implemented to remedy past or present discrimination, Defendant–Intervenors should be given the opportunity to present evidence that remedying discrimination was the "actual" purpose behind the LSA's admissions programs.

According to Defendant–Intervenors, "[d]espite the University's sole reliance on *Bakke's* diversity rationale in this litigation, the record quite clearly shows that the University was motivated by both diversity and remedial purposes in adopting its affirmative action program." (Def.–Intervenors' 9/1/00 Sur–Reply at 5). It is not enough, however, that remedial measures "may have" motivated the LSA in adopting the challenged admissions programs. As part of their burden, Defendant–Intervenors must establish that remedial measures "actually" motived the challenged race-conscious programs. *See Shaw*, 517 U.S. at 908 n. 4, 116 S.Ct. at 1902 n. 4.

In this Court's opinion, Defendant–Intervenors have failed to present any evidence that the discrimination alleged by them, or the continuing effects of such discrimination, was the real justification for the LSA's race-conscious admissions programs. Although not dispositive, the University Defendants have never claimed that the challenged programs were implemented as a means to remedy past discrimination. *See Hogan*, 458 U.S. at 727 n. 16, 102 S.Ct. at 3339 n. 16 (stating that even if court were to assume discrimination had occurred, challenged policy would nonetheless be invalid because the state failed to establish that the legislature "intended" the challenged policy to compensate for any perceived discrimination); *Lutheran Church–Mo. Synod v. F.C.C.*, 141 F.3d 344, 354 (D.C.Cir.1998) (rejecting interest asserted by Department of Justice in support of F.C.C. administrative regulation because "[a]s the independent agency which promulgated the regulation in question, [the F.C.C.'s] view of the government interest it was pursuing must be accepted").

Furthermore, the terms of the admissions policies themselves indicate that they were developed to achieve diversity, not as a means to remedy discrimination. For example, the 1997 guidelines refer to "students who meet the spirit of contributing to a *diverse class*." (Pls.' 4/9/99 Exs., Ex. AA at ¶ F.1) (emphasis added). The 1998, 1999, and 2000 admissions guidelines state that "[a]dmission is based on several factors that combine to produce a freshman class that provides *a mixture of attributes and characteristics* valued by the University," and that it is the University's "sincere belief that this *mixture* contributes to the education of our students, as well as fulfills the University's mission to prepare society's future citizens and leaders." (Pls.' 4/9/99 Exs., Ex. DD at ¶ I.B.4 & Ex. EE at 1 (1998); Kolbo Aff., Ex. A at ¶ I.B.4 & Ex. B at 1 (1999); Ex. C at ¶ I.B.4 & Ex. D at 2 (2000) (emphasis added)). The guidelines also state that the University was "committed to an educational experience that involves students interacting with other students of different races and ethnicities than their own." (Pls.' 4/9/99 Exs., Ex. EE at 7 (1998); Kolbo Aff., Ex. A at ¶ I.B.4 & Ex. B at 1 (1999); Ex. C at ¶ I.B.4 & Ex. D at 2 (2000)).

Moreover, Defendant–Intervenors acknowledge that the admissions policies at issue were a result of the Michigan Mandate. (Def.–Intervenors' 9/1/00 Sur–Reply at 7). President Duderstadt has "described the Michigan Mandate as an attempt to better respond to the diversity of the nation and the world, by trying to change the nature of the institution itself

so that all ethnic groups could be brought fully into the life and leadership of the institution," and enacted "with the goal of building a multicultural learning community which values, respects, and draws intellectual strength from the rich diversity of people of different races." (Pls.' 6/1/99 Exs., Exs. H & I). In a series of letters written in 1995, President Duderstadt explained the Michigan Mandate as the University's "commitment to make the University of Michigan a national and world academic leader in the *racial and ethnic diversity* of its faculty, students, and staff," and repeatedly referred to the University's efforts to "achieve diversity," "better reflect ethnic, racial, and socioeconomic diversity," and "to build a richly diverse community of students." (Pls.' 6/1/99 Exs., Exs. D, E, & F) (emphasis added).

The fact that none of the evidence cited by Defendant–Intervenors even discusses past or present discriminatory conduct toward Native Americans is further evidence that the University's race-conscious admissions policies were not designed with a remedial purpose in mind. *See Croson*, 488 U.S. at 506, 109 S.Ct. at 728 (stating that the "random inclusion of racial groups that, as a practical matter, may never have suffered from discrimination ... suggests that perhaps the city's purpose was not in fact to remedy past discrimination"). The justifications for a suspect policy or program must be "genuine, not hypothesized or invented *post hoc* in response to litigation." *United States v. Virginia*, 518 U.S. at 533, 116 S.Ct. at 2275.

"[A] tenable justification must describe actual state purposes, not rationalizations for actions differently taken." *Id.* at 535, 116 S.Ct. at 2277. Defendant–Intervenors have presented no evidence that the LSA's race-conscious admissions programs were enacted to counter the present effects of

past discriminatory policies or the discriminatory impact of the other SCUGA factors. To the contrary, all of the evidence supports the conclusion that the University's race-conscious admissions programs were specifically designed for the purpose advanced by the University Defendants, *i.e.* racial and ethnic diversity. Therefore, even if the Court were to assume that the alleged discrimination or continuing effects thereof exists today, Defendant–Intervenors' argument would nonetheless fail as there is no evidence that the LSA's race-conscious admissions programs were actually put in place to remedy such discrimination. *See Hogan*, 458 U.S. at 727 n. 16, 102 S.Ct. at 3339 n. 16.

### 2. The University's History of Discrimination

Conversely, even if Defendant–Intervenors had presented evidence that the LSA's race-conscious admissions programs were actually implemented in an effort to remedy past or current discrimination, Defendant–Intervenors' argument would nonetheless fail because Defendant–Intervenors have failed to establish a genuine issue of fact as to whether the identified discrimination in fact exists or existed, as well as whether the race-conscious admissions policies are necessary to remedy such discrimination. Defendant–Intervenors assert that the LSA's consideration of race in admissions decisions "serves compelling interests in remedying the continuing effects of long-standing discrimination at the University." (*Id.* at 6). According to Defendant–Intervenors, "Professor James Anderson's expert report and other evidence in the record establish that since its founding, the University has engaged in racially discriminatory and exclusionary practices against minorities." (*Id.* at 7). Specifically, Defendant–Intervenors contend that:

The record shows that the University tolerated the presence of a few minorities, but that it refused to integrate them meaningfully into campus life, establishing racially segregated housing, maintaining segregated fraternities and sororities, and—when the University finally permitted African–American students to live on campus in dormitories—acquiescing to white students who refused to room with them. Through the years and to the present, minority students have struggled to maintain their presence on campus, enduring racial incidents on campus and in classrooms, from other students, faculty and staff. The University, even after receiving these complaints and corroborating student experiences, either refused to act, or did so in a woefully inadequate manner.

(*Id.* at 7).

In his expert report, Professor James Anderson, Head of the Department of Educational Policy Studies and Professor of History at the University, recounts the history of the University from 1817 to the present. According to Professor Anderson, although the University was founded in 1817, it was not until 1868 that the first African American students were enrolled, and up until 1930, African Americans were systematically excluded from University-owned housing. (Anderson Rep. at 3–10). On-campus housing remained segregated up until the 1960s.

Moreover, despite the fact the Michigan Civil Rights Congress had called for an end to discriminatory clauses in the constitutions and by-laws of all campus organizations in 1949, and in 1952 the Committee on Student Affairs accepted a proposal to eliminate discriminatory clauses in fraternity and sorority by-laws, then University President Harlan Hatcher rejected such proposals and allowed student organizations to continue to prohibit membership based on race, religion, or color. (*Id.* at 5). According to one observer, as of 1959, no fraternity had ever accepted an African American student. (*Id.* at 11). Through the late 1950's, the University refused to integrate its housing by continuing its policy of respecting students' wishes who did not wish to live with a student of another race. (*Id.* at 7).

In 1966, the Defense Department conducted an investigation of the University's compliance with Title VI of the Civil Rights Act of 1964, ultimately urging the University to increase its enrollment of African American students, faculty, and staff. (*Id.* at 9). In 1967, the University's first black professor, Professor Albert Wheeler, wrote a letter to then Vice Presidents Allan Smith and Frank Pierpont expressing his fear that the University had developed an "unfavorable image" among the African American community. (*Id.* at 15). During her deposition, a 1971 graduate of the LSA recounts how University staff actively discouraged her from applying to the LSA, and that one admissions counselor specifically told her that "community college might be better suited for [her]." (Glenn Dep. at 10).

During the 1970s, minority students often voiced their concern regarding the University's failure to address campus racism and to increase minority enrollment. (Anderson Rep. at 17–19). According to Defendant–Intervenors, throughout the 1970s and 1980s, the University "continued to tolerate racial tensions on campus that had a devastating effect on minority enrollment, and minority participation and sense of belonging on campus." (Def.–Intervenors' Br. Resp. Pls.' Mot. Summ. J. at 13; Anderson Rep. at 32–34). Racial tension in the dorms became widely publicized in the early 1970s. (Anderson Rep. at 35). "Both University officials and students ac-

knowledge[d] the severity of racial tensions within the dormitory system, and the inadequacy of any attempt to improve them." (*Id.*).

A 1980 study of African American students at the University revealed that eighty-five percent of the students surveyed had encountered racial discrimination while at the University, ninety percent wanted more African American students at the University, and over sixty percent stated they had little or no contact with African American faculty and staff. (*Id.* at 52). Expert Dr. Joe R. Feagin, Ph.D., a graduate research professor in sociology at the University of Florida, also reports that a 1980 survey of more than two hundred black undergraduates at the University of Michigan revealed that "most had faced verbal and other racial harassment since arrival" at the University, mostly comprised of "total avoidance by white students and subtle actions or statements with racist overtones." (Feagin Rep. at 9). Between 1976 and 1985, the University suffered a drastic decline in minority enrollment, losing 34 percent of its African American students. Niara Sudakasa, Report on Minorities, Handicappers and Women in Michigan's Colleges and Universities at 10 (1986).

From 1986 to 1987, a number of racist events occurred at the University, including the distribution of racist fliers, vandalism in the minority lounge, and racist jokes broadcast over the University's campus radio station. (Anderson Rep. at 62; Ransby Dep. at 19–21, 33–34). An investigation resulted in a report recognizing that African American students at the University were "likely to be subjected to ridicule, abuse, and threat," as well as "instructors who make openly racist comments, inside and outside of class," and that the radio broadcasts were "only a

symptom of a pervasive atmosphere on this campus." (Anderson Rep. at 63–64).

In 1995, students continued to voice concerns regarding racism on the University's campus, citing incidents in which racist messages were scrawled on walls and sent via e-mail. (Anderson Rep. at 74–75). Professor Anderson, however, also reports that "[g]eneral perceptions of racial climate on campus among students of color have become more positive," and that a 1994 study revealed that "students of color in general do not perceive tremendous tension, nor do White students feel overwhelmed by hostility from students of color." (*Id.* at 76–77). According to Professor Anderson, "perceptions of racial climate, particularly in the residence halls, are significantly more positive in the post Michigan Mandate era." (*Id.* at 77).

Dr. Feagin also reports of "several dozen complaints by black students and staff at the University" describing racist incidents from 1990 through 1999, including racist graffiti, racially derogatory remarks, white supremacist group lettering, racist slurs by whites on or near campus, racist e-mail messages, and racist literature. (Feagin Rep. at 9–10). Dr. Feagin attributes the University's racially hostile environment to white students (*Id.* at 14–18), white professors' perceived attitudes toward minority students (*Id.* at 21–23), negative experiences with campus security personnel (*Id.* at 24–26) (*see also* Def.–Intervenors' 8/11/00 Exs., Vol. IV, Ex. 7), and negative experiences with other white staff members (*Id.* at 27–28).

It is also Dr. Walter Allen's expert opinion that "African American and Latino/Hispanic students regularly experience racial incidents on the [University's] campus" and "describe a hostile racial environment." (Allen Rep. at 13). According to Dr. Allen, African American and Latino students report being the subject of racial

stereotypes in the classroom and that "white faculty and white students avoid interacting with them outside of class." (*Id* . at 14). Defendant–Intervenors have also presented portions of deposition testimony from several past and present minority students, who have each recounted incidents in which they have experienced racial hostility or stereotyping by other students or faculty members. (Def.–Intervenors' 8/11/00 Exs., Vol. IV, Exs. 1–6).

### 3. Present Effects of the University's Prior Discrimination

As an initial matter, the Court notes that Defendant–Intervenors have presented the Court with no evidence that the University or the LSA ever facially discriminated against minorities in admissions decisions. There is absolutely no evidence that minorities were ever outright excluded from admission to the University; nor is there any evidence that the University's past admissions programs had a discriminatory impact on minority applicants.

Furthermore, with the exception of racial hostility, which Defendant–Intervenors have presented evidence of well into the 1990s, all of the University's allegedly discriminatory conduct cited by the Defendant–Intervenors, *i.e.* segregated housing, segregated fraternities, and policies allowing non-minority students to refuse to room with minority students, occurred years before the challenged admissions policies were put in place. Where the identified discrimination has occurred in other than the immediate past, "the inquiry into the legitimacy of a race-based classification turns to the state's basis for finding continuing effects of such past discrimination." *Podberesky v. Kirwan,* 956 F.2d 52, 56 (4th Cir.1992), *vacated on other grounds,* 38 F.3d 147 (4th Cir.1994); *Wygant,* 476 U.S. at 280, 106 S.Ct. at 1850; *Fullilove v. Klutznick,* 448 U.S.

448, 480, 100 S.Ct. 2758, 2775, 65 L.Ed.2d 902 (1980) ("We recognize the need for careful judicial evaluation to assure that any … program that employs racial or ethnic criteria to accomplish the objective of remedying the present effects of past discrimination is narrowly tailored to the achievement of that goal."). According to Defendant–Intervenors, "[t]he continuing effects of the discrimination against minority students is evident in the fact that students of color, understandably concerned with the school's reputation for discrimination and racial insensitivity, *may* be deterred from applying." (Def.–Intervenors' Br. Resp. Pls.' Renewed Mot. Summ. J. at 17) (emphasis added).

As evidence that the University's prior discriminatory policies have continually deterred African Americans from attending the University, Defendant–Intervenors cite the fact that as the percentage of African Americans graduating high school in Michigan rose from 8.9% in 1976 to 10.97% in 1983, the percentage of African Americans enrolled at the LSA decreased from 7.2% to 5.14%. (*Id.* at 18).

As the Supreme Court has recognized, reliance on statistical disparities to establish a *prima facie* pattern or practice of discriminatory conduct is not appropriate where special qualifications are required. *See Croson,* 488 U.S. at 501, 109 S.Ct. at 726 ("But it is equally clear that when special qualifications are required to fill a particular job, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value.") (internal quotation omitted). "[W]here special qualifications are necessary, the relevant statistical pool for purposes of demonstrating discriminatory exclusion must be the number of minorities qualified to undertake the particular task." *Id.* at 501–02, 109 S.Ct. at 726. Defen-

dant–Intervenors have presented no evidence regarding the number of African Americans graduating high school in 1976 or 1983 that were qualified to attend the University, nor, more importantly, the number of high school graduates even interested in attending college.

Furthermore, the Court finds Defendant–Intervenors' statistical data from 1976 and 1983 to be of little probative value with respect to whether such policies served to deter African American and other minority students from applying to the University in 1995 when the first of the challenged admissions programs was implemented. As Defendant–Intervenors themselves acknowledge, "[t]he years after the passage of the Civil Rights Act of 1964 saw a marked increase in the number of African American students attending the University." (*Id.* at 10). Although there were only approximately thirty-five African Americans enrolled at the University in 1935, in 1966, African American students constituted 1.2 percent of the University's 32,000 student population, 3.5 percent in 1970, 6.8 percent in 1972, and 7.1 percent in 1990. The fact that the percentage of minority students attending the University has steadily increased tends, in this Court's opinion, to indicate that any deterrent effect the University's prior discriminatory policies and practices may have had has dwindled in recent times.

Defendant–Intervenors also assert that "[t]he parents of the children who present themselves for admissions to Michigan today, did not have the economic and social advantage gained from attending an institution such as Michigan, and thus cannot pass on the full range [of] advantages to their children that many white parents, who are more likely to have attended Michigan, can." (Def.–Intervenors' Br. Resp. Pls.' Renewed Mot. Summ. J. at 18).

Defendant–Intervenors, however, have provided no link between any particular identified discrimination on behalf of the University and the social or economic disadvantage of such parents. As previously discussed, generalized assertions of past discrimination in a particular spectrum, such as college admissions, or of societal discrimination, do not provide a strong basis for engaging in remedial action. *See Shaw,* 517 U.S. at 909–10, 116 S.Ct. at 1902–03.

Although Defendant–Intervenors frame their argument in terms of remedying the continuing effects of the University's prior discrimination, it is clear from the evidence cited by Defendant–Intervenors that the alleged deterrence stems from the past and current racial hostility on campus and/or the University's alleged acquiescence in such hostility, not from any "identified" discrimination by the University itself. Accordingly, the Court rejects Defendant–Intervenors' contention that the University has a compelling interest in remedying any present effects of its own past discrimination.

### 4. The University's Past and Current Hostile Racial Climate

Defendant–Intervenors have presented ample evidence that minority students at the University have been, and continue to be subjected to, racial hostility, stereotyping, and isolation. According to Defendant–Intervenors, "[t]his hostile environment is perpetuated by various aspects of the University community, including other students, University staff, and professors." (Def.–Intervenors' Br. Resp. Pls.' Renewed Mot. Summ. J. at 19). As Defendant–Intervenors explain, "[b]y increasing the numbers of African–Americans and Latinos, race-conscious admissions provides the critical mass of minority students required to remedy this negative social cli-

mate and the detrimental isolation that they experience." (*Id.*).

According to Defendant–Intervenors' experts, studies show that race-conscious admissions programs serve to remedy this negative racial climate by creating a "critical mass" of African American and Latino students on campus such that African American and Latino students are "able to form the necessary community and social support networks associated with success." (*Id.* at 23–24; Allen Rep. at 7). Defendant–Intervenors further assert that "[t]his increase in numbers serves to reduce the racial isolation that is so harmful to the educational experiences of minority students, increase intergroup interaction, and thus help diminish negative racial stereotypes and racial hostility." (*Id.* at 24).

As Defendant–Intervenors correctly acknowledge, although the University itself is not the cause of the alleged racial hostility, it may take affirmative steps to dismantle a system of racial exclusion in which it has become a passive participant. *Croson*, 488 U.S. at 492, 109 S.Ct. at 720. Defendant–Intervenors, however, have provided no evidence that the University has been a "passive participant" in the more recent racial episodes outlined above. As the Supreme Court has acknowledged, there is no doubt that the sorry history of both private and public discrimination in this country has contributed to a lack of opportunities for African Americans. This observation, however, by itself, is not sufficient to justify race-conscious measures. *Id.* at 499, 109 S.Ct. at 724.

5. *Discriminatory Effect of the University's Current Admissions Policies*

Next, Defendant–Intervenors assert that the University's race-conscious admissions policies are necessary to counteract other factors in its admissions policies that have an adverse impact on minority applicants. (Def.–Intervenors' Br. Resp. Pls.' Renewed Mot. Summ. J. at 26–32). Defendant–Intervenors have presented the expert reports of William T. Trent, and Drs. Jacob Silver and James Rudolph, in support of their assertion that other factors considered in the University's admissions policies have an adverse impact on minority applicants, specifically African Americans and Latino Americans.

According to Defendant–Intervenors, the SCUGA factors "are used to enhance the GPAs or selection index point totals of white applicants to a significantly greater degree than for African–American and Latino applicants, rendering the latter less competitive in the admissions process." (*Id.* at 30; Trent Rep. at 7; Silver & Rudolph Rep. at 14–15). For example, African American and Latino applicants are less likely to attend high schools that receive a high "S" (school) factor, or offer advanced courses contributing to an applicant's "C" (curriculum) factor. (*Id.* at 27–28; Trent Rep. at 4–7). Similarly, due to the University's past history of discrimination, it is less likely that a minority student will receive any alumnus "A" (alumni) points. (*Id.* at 29; Trent Rep. at 7; Silver & Rudolph Rep. at 16–17). Furthermore, minority students are less likely to reside in the forty-five northern Michigan counties that the University identifies as underrepresented under its "G" (geography) factor.[2] (*Id.* at 30; Trent Rep. at 7; Silver & Rudolph Rep. at 16).

In this Court's opinion, Defendant–Intervenors' reliance upon the discriminatory impact of the other SCUGA factors is misplaced as the SCUGA factors are but one component of the overall race-conscious admissions programs that Plaintiffs seek

---

**2.** The "U" (unusual) factor includes under-represented minority status.

to invalidate. Because both the allegedly discriminatory SCUGA factors and the racial preferences are part of the same program, there is no overall discriminatory impact.

Moreover, if the current selection criteria have a discriminatory impact on minority applicants, it seems to this Court that the narrowly tailored remedy would be to remove or redistribute such criteria to accommodate for socially and economically disadvantaged applicants of all races and ethnicities, not to add another suspect criteria to the list. Accordingly, the Court finds Defendant–Intervenors' contention to be unpersuasive.

### Conclusion

Defendant–Intervenors have failed to cite any evidence that the LSA's race-conscious admissions criteria were actually motivated by a desire to remedy any past or present discrimination by the University. Furthermore, the Court is satisfied that the LSA's race-conscious admissions programs cannot be justified as measures to remedy either the current effects of past discrimination, or the discriminatory impact of the LSA's other admissions criteria. Because Defendant–Intervenors have failed to present sufficient evidence to create a genuine issue of material fact in support of their claim that the LSA's admissions programs in existence from 1995 through 1998 were a narrowly tailored means of achieving the compelling governmental interest of remedying the present effects of past discrimination, Plaintiffs are entitled to summary judgment on this issue.[3]

To survive summary judgment, the nonmoving party "is required to do more than simply show that there is some 'metaphysical doubt as to the material facts.'" *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 800 (6th Cir.1994) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). The Court is satisfied that Defendant–Intervenors have failed to sustain this burden. Therefore, Plaintiffs' motion for summary judgment with respect to Defendant–Intervenors' claim that the University was justified in using race as a factor in admissions to remedy the present effects of past discrimination shall be granted, and Defendant–Intervenors' claims that the University was justified in using race as a factor in admissions to remedy the present effects of past discrimination shall be dismissed.

An Order consistent with this Opinion shall issue forthwith.

---

3. The Court notes that its decision today has no practical effect on its prior decision regarding the LSA's admissions programs in existence for 1999 and 2000, as such policies were previously found to be constitutional as a narrowly tailored means of achieving a compelling governmental interest, *i.e.* diversity. *See Gratz*, 122 F.Supp.2d at 827–31.