Jennifer GRATZ and Patrick Hamacher, for themselves and all others similarly situated, Plaintiffs,

v.

Lee BOLLINGER, et al., Defendants,

and

Ebony Patterson, et al., Intervening Defendants.

No. 97–75231.

United States District Court,
E.D. Michigan,
Southern Division.

Jan. 27, 2005.

David F. Herr, Mason, Edelman, Minneapolis, MN, Glen N. Lenhoff, Law Office of Glen N. Lenhoff, Flint, MI, James K. Fett, Fett & Fields (Pinckney), Pinckney, MI, Kerry L. Morgan, Pentiuk, Couvreur,

Wyandotte, MI, Kirk O. Kolbo, Maslon, Edelman, Minneapolis, MN, for Plaintiffs.

Godfrey J. Dillard, Detroit, MI, Christopher M. Taylor, Butzel Long, Ann Arbor, MI, Jane Sherburne, Wilmer, Cutler, John A. Payton, Wilmer, Cutler, John H. Pickering, Wilmer, Cutler, Washington, DC, Leonard M. Niehoff, Butzel Long, Ann Arbor, MI, Philip J. Kessler, Butzel Long (Detroit), Detroit, MI, for Defendants.

H. Wallace Parker, Bloomfield Law Center, Richard A. Wilhelm, Dickinson Wright, Bloomfield Hills, MI, Susan I. Leffler, Lansing, MI, Brice M. Clagett, Keith A. Noreika, Oscar M. Garibaldi, Covington, Burling, Kenneth Geller, Mayer, Brown, Deanne E. Maynard, Jenner & Block, Washington, DC, Dwight K. Hamilton, Steelcase Inc., Grand Rapids, MI, Jeffrey S. Silver, Chicago, IL, Jon D. Botsford, Steelcase Inc., Grand Rapids, MI, Randall E. Mehrberg, Chicago, IL, Shilpa S. Satoskar, Jenner & Block, Washington, DC, for Movants.

## *OPINION*

DUGGAN, District Judge.

On October 14, 1997, Plaintiffs filed this class-action lawsuit challenging the admissions policy of the University of Michigan's ("University") College of Literature, Science, and the Arts ("LSA"). Presently before the Court is Plaintiffs' motion for an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

**Factual and Procedural Background**

Plaintiffs, both of whom are Caucasian, brought this lawsuit alleging that Defendants violated Title VI of the Civil Rights Act of 1964, codified at 42 U.S.C. § 2000d, the Equal Protection Clause of the Fourteenth Amendment, and 42 U.S.C. § 1981, by considering race as a factor in the LSA's admissions policies. Plaintiffs sought, *inter alia,* compensatory and punitive damages for past violations, declaratory relief finding that Defendants violated their rights to nondiscriminatory treatment, an injunction prohibiting Defendants from continuing to discriminate on the basis of race in violation of the Fourteenth Amendment, and an order requiring the LSA to offer Plaintiff Hamacher admission as a transfer student.

A group of African–American and Latino students who applied for, or intended to apply for, admission to the University, as well as the Citizens for Affirmative Action's Preservation, a Michigan nonprofit organization, sought to intervene pursuant to Rule 24 of the Federal Rules of Civil Procedure. The Intervenors claimed the resolution of the case directly threatened the access of qualified African–American and Latino students to public higher education and that the University would not adequately represent their interest in educational opportunity. This Court denied the request to intervene, but the Sixth Circuit reversed. *See Gratz v. Bollinger,* 188 F.3d 394 (6th Cir.1999).

On December 23, 1998, this Court issued an Order certifying a class and bifurcating the proceedings into a liability and damages phase. The Court certified a class consisting of "those individuals who applied for and were not granted admission to the [LSA] for all academic years from 1995 forward and who are members of those racial or ethnic groups, including Caucasian, that [D]efendants treated less favorably on the basis of race in considering their application for admission." *See Gratz v. Bollinger,* 122 F.Supp.2d 811, 814 n. 2 (E.D.Mich.2000). During the liability phase, the Court would determine "whether Defendants' use of race as a factor in admissions decisions violates the Equal Protection Clause of the Fourteenth Amendment to the Constitution." *See id.* Plaintiffs' request for injunctive and declaratory relief also would be considered

during the liability phase of the proceedings. *See id.*

The parties subsequently filed cross-motions for summary judgment with respect to liability. Plaintiffs asserted that Defendants' use of race as a factor in admissions to the LSA violated Title VI, § 1981, and the Equal Protection Clause of the Fourteenth Amendment. Relying on Justice Powell's opinion in *Regents of University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), Defendants responded that the consideration of race as a factor in admissions decisions might serve a compelling government interest in some cases and the LSA had such an interest in the educational benefits that result from having a racially and ethnically diverse student body. Defendants further argued that the LSA's admissions policy was narrowly tailored to serve that interest. The Intervenors argued that the LSA had a compelling interest in remedying the University's past and current discrimination against minorities.

This Court concluded that Defendants presented "solid evidence" that a racially and ethnically diverse student body produces significant educational benefits such that achieving such a student body constitutes a compelling governmental interest. *Gratz,* 122 F.Supp.2d at 822. However, the Court further concluded that the admissions policy Defendants utilized from 1995 through 1999 was not narrowly tailored to achieve that interest. *Id.* at 831–33. The Court reached a different result with respect to the policy Defendants began using in 1999. *Id.* at 831. Because the Court found that the new policy did not utilize rigid quotas, seek to admit a predetermined number of minority students, or establish a two-track system for applicants, the Court held that it was narrowly tailored to achieve the University's compelling interest in a diverse student body. *Id.* at 828–31.

Based on these findings, the Court granted Plaintiffs' motion for summary judgment with respect to the admissions policy in existence from 1995 through 1998, and granted Defendants' motion with respect to the admissions programs from 1999 forward. *Id.* at 836. Because the Court ruled that the current admissions policy was constitutional, it denied Plaintiffs' request for injunctive relief. *Id.* The Court also issued an opinion and order rejecting the Intervenors' arguments, concluding that the Intervenors "failed to present any evidence that the discrimination alleged by them, or the continuing effects of such discrimination, was the real justification for the LSA's race-conscious admissions programs." *Gratz v. Bollinger,* 135 F.Supp.2d 790, 795 (E.D.Mich.2001).

· The Court subsequently certified two questions for interlocutory appeal to the Sixth Circuit pursuant to 28 U.S.C. § 1292(b). The Sixth Circuit permitted the appeal and granted Plaintiffs' subsequent motion for initial hearing *en banc.* The appellate court scheduled oral argument for December 6, 2001, the same day as the hearing in *Grutter v. Bollinger*—a class-action lawsuit challenging the University's law school admissions policies.

On May 14, 2002, the Sixth Circuit issued its decision in *Grutter. Grutter v. Bollinger,* 288 F.3d 732 (6th Cir.2002). In its opinion, the court indicated that it would separately render its decision in *Gratz* in a "forthcoming opinion." *Id.* at 735 n. 2 On October 1, 2002, because the Sixth Circuit had not issued an opinion in this case and a petition for writ of certiorari from the Supreme Court already was pending in *Grutter,* Plaintiffs petitioned the Supreme Court for a writ of certiorari before judgment. The Supreme Court granted the petition on December 2, 2002, with respect to the following question:

Does the University of Michigan's use of racial preferences in undergraduate admissions violate the Equal Protection Clause of the Fourteenth Amendment, Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d), or 42 U.S.C. § 1981?

*Gratz v. Bollinger*, 537 U.S. 1044, 123 S.Ct. 602, 154 L.Ed.2d 515 (2002). The Supreme Court heard separate arguments for *Gratz* and *Grutter* on April 1, 2003.

On June 23, 2003, the Supreme Court issued opinions in both cases. *Gratz v. Bollinger*, 539 U.S. 244, 123 S.Ct. 2411, 156 L.Ed.2d 257 (2003); *Grutter v. Bollinger*, 539 U.S. 982, 124 S.Ct. 35, 156 L.Ed.2d 694 (2003). As the Supreme Court set forth in its opinion in this case, Plaintiffs raised two arguments in their challenge to this Court's opinion granting summary judgment to Defendants. The Supreme Court described Plaintiffs' first argument:

> [Plaintiffs] argue[d], first and foremost, that the University's use of race in undergraduate admissions violates the Fourteenth Amendment. Specifically, they contend that this Court has only sanctioned the use of racial classifications to remedy identified discrimination, a justification on which [Defendants] have never relied ... [Plaintiffs] further argue that diversity as a basis for employing racial preferences is simply too open-ended, ill-defined, and indefinite to constitute a compelling interest capable of supporting narrowly-tailored means.

*Gratz*, 539 U.S. at 268, 123 S.Ct. at 2426. Alternatively, Plaintiffs argued that even if the University's interest in diversity can constitute a compelling state interest, use of race in its admissions policy was not narrowly tailored to achieve such an interest. *Id.*

The Supreme Court rejected Plaintiffs' first argument, referring to its holding in *Grutter* that a university's interest in a racially and ethnically diverse student body is a compelling interest that may justify its consideration of race in the admissions process. *Id.* at 268–69, 123 S.Ct. at 2426–27 (citing *Grutter*, 539 U.S. at 328–331, 123 S.Ct. at 2338–41). The Supreme Court agreed with Plaintiffs, however, that the LSA's admissions policy was not narrowly tailored to achieve that compelling interest and therefore violates the Equal Protection Clause of the Fourteenth Amendment, Title VI, and 42 U.S.C. § 1981. *Id.* at 269–75, 123 S.Ct. at 2427–30. The Supreme Court therefore reversed this Court's decision granting Defendants' summary judgment motion with respect to liability and remanded the case for proceedings consistent with its opinion.

In a footnote to its decision, the Supreme Court upheld this Court's rejection of the Intervenors' justification for the LSA's race-conscious admissions programs. *Id.* at 257 n. 9, 123 S.Ct. at 2420 n. 9. As the Supreme Court stated, the Intervenors "failed to present any evidence that the discrimination alleged by them, or the continuing effects of such discrimination, was the real justification [for the admissions policy]." *Id.* (quoting *Gratz*, 135 F.Supp.2d at 795). The Court further stated, "... to the extent respondent-intervenors reassert this justification, a justification the University has *never* asserted throughout the course of this litigation, we affirm the District Court's disposition of the issue." *Id.* (emphasis in original).

On June 30, 2004, Plaintiffs filed the pending motion seeking an interim award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988. Plaintiffs seek an award in the amount of $2,071,352.84. These fees and costs represent expenditures from the Fall of 1997 through the filing of their motion. During that period, Plaintiffs were represented by at least sixteen attorneys from three different law firms.

Plaintiffs were represented by the following lawyers from the private law firm of Maslon, Edelman, Borman & Brand, LLP ("Maslon"): partners Kirk O. Kolbo, David F. Herr, R. Lawrence Purdy, and Michael C. McCarthy; associates Kai H. Richter, Jason A. Lien, and Dawn C. Van Tassel; and former associate Peter Carlton. Maslon is located in Minneapolis, Minnesota. The Maslon attorneys seek $1,398,120.25 in attorneys' fees and $3,947.76 in costs. Plaintiffs also were represented by the following lawyers from the Center for Individual Rights ("CIR"), a public interest law firm located in Washington, D.C.: Michael E. Rosman, Hans Bader, Michael McDonald, James Wright, Michael Troy, Ralph Casale, and Silvio Krvaric. A number of law students working for CIR also assisted in the litigation, including Robert Worst, Chris Roach, Andrew Stein, and Gene Healy. CIR seeks $254,230.75 in attorneys' fees and $330,363 in costs.[1] CIR's costs include expenses incurred by CIR and monies CIR reimbursed to other attorneys, primarily the Maslon attorneys, for their expenses.

Plaintiffs also were represented by local counsel in the Eastern District of Michigan. Patrick Wright served as Plaintiffs' local counsel through early 1998. Beginning in October 1997, Kerry L. Morgan, of counsel of the eight lawyer firm of Pentiuk, Couvreur & Kobiljak in Wyandotte, Michigan, served as Plaintiffs' local counsel. Mr. Morgan seeks attorney's fees and costs in the amount of $84,691.08.

Defendants oppose Plaintiffs' motion for an award of attorneys' fees and costs. First, Defendants contend that Plaintiffs are not "prevailing parties" pursuant to § 1988. Alternatively, Defendants argue that the fees and costs Plaintiffs seek are not reasonable. Defendants raise a number of specific challenges to the requested fees and costs. First, Defendants argue that Plaintiffs' fees should be reduced to reflect their limited success-i.e. failing to eliminate race as a legitimate and lawful consideration in college admissions policies. Second, Defendants claim Plaintiffs' billing records are too vague for the Court to judge their reasonableness. Third, Defendants argue that certain categories of the fees Plaintiffs seek are not recoverable, such as the following: (a) fees related to the Intervenors; (b) fees related to public and media relations efforts; (c) fees representing a duplication of effort by the multiple lawyers and law firms representing Plaintiffs; and (d) fees related to travel. Finally, Defendants contend that the hourly rates requested by Plaintiffs far exceed the rate prevailing in the forum market.

### Applicable Law and Analysis

### Attorneys' Fees in General and the Meaning of the Term "Prevailing Party"

In the United States, parties ordinarily are required to bear their own attorneys' fees. *See, e.g., Buckhannon Bd. and Care Home, Inc. v. W. Va. Dep't of Health and Human Res.,* 532 U.S. 598, 602, 121 S.Ct. 1835, 1839, 149 L.Ed.2d 855 (2001) (citations omitted). Under this rule the "American Rule" the prevailing party is not entitled to collect fees and costs from the opposing party absent explicit statutory authority. *Id.* Congress, however, has authorized the award of attorneys' fees and costs to the prevailing party in numerous statutes, including the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988. Section 1988 provides in relevant part:

---

1. The amount requested by CIR includes $5,667.19 in fees for one of Plaintiffs' local counsel, Patrick Wright. The costs sought by CIR are based on $273,836.08 in expenses and $56,526.92 in interest on those expenses.

In any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs ...

42 U.S.C. § 1988.

As the Supreme Court has stated, the threshold determination of whether a plaintiff is a "prevailing party" has been framed in various ways. *See Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). After reviewing the legislative history of § 1988, the Supreme Court has found that "Congress intended to permit the interim award of counsel fees only when a party has prevailed on the merits *of at least some* of his claims." *Hanrahan v. Hampton*, 446 U.S. 754, 758, 100 S.Ct. 1987, 1989, 64 L.Ed.2d 670 (1980)(*per curiam*) (emphasis added). As the *Hensley* Court explained, "[a] typical formulations is that 'plaintiffs may be considered "prevailing parties" for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.'" *Hensley*, 461 at 433, 103 S.Ct. at 1939 (quoting *Nadeau v. Helgemoe*, 581 F.2d 275, 278–79 (1st Cir.1978)). The Supreme Court has held that "at a minimum, to be considered a prevailing party within the meaning of § 1988, the plaintiff must be able to point to a resolution of the dispute which changes the legal relationship between itself and the defendant." *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 792, 109 S.Ct. 1486, 1493, 103 L.Ed.2d 866 (1989)(citing *Hewitt v. Helms*, 482 U.S. 755, 760–61, 107 S.Ct. 2672, 2675–76, 96 L.Ed.2d 654 (1987)).

■ Defendants argue that Plaintiffs are not prevailing parties because they have not secured an enforceable judgment against Defendants *that directly benefits* any Plaintiff. In other words, Defendants argue that while the LSA's admissions policies may have been declared unconstitutional by the Supreme Court, "[n]either Gratz, nor Hamacher, nor any class member has shown that they *were not admitted* because of the manner in which the University considered race under its stricken undergraduate policies but *would have been admitted* if the University had considered race in a manner approved by *Grutter*." *See* Defs.' Resp. at 4–5 (emphasis in original). This argument, however, ignores one of Congress' primary reasons for enacting § 1988.

Congress specifically enacted § 1988 to encourage "private attorney generals" to further the interests of the general public. As the Supreme Court has explained:

> ... [W]e reject the notion that a civil rights action for damages constitutes nothing more than a private tort suit benefiting only the individual plaintiffs whose rights were violated. Unlike most private tort litigants, a civil rights plaintiff seeks to vindicate important civil and constitutional rights that cannot be valued solely in monetary terms. *See Carey v. Piphus*, 435 U.S. 247, 266, 98 S.Ct. 1042, 1053–55[1053–54], 55 L.Ed.2d 252 (1978). And, Congress has determined that "the public as a whole has an interest in the vindication of the rights conferred by the statutes enumerated in § 1988, over and above the value of a civil rights remedy to a particular plaintiff ..." *Hensley*, 461 U.S., at 444, n. 4, 103 S.Ct. at 1945, n. 4 (BRENNAN, J., concurring in part and dissenting in part). Regardless of the form of relief he actually obtains, a successful civil rights plaintiff often secures important social benefits that are not reflected in nominal or relatively small damages awards.

*City of Riverside v. Rivera,* 477 U.S. 561, 574, 106 S.Ct. 2686, 2694, 91 L.Ed.2d 466 (1986). As the *Rivera* Court further explained, "... a plaintiff who obtains relief in a civil rights lawsuit does so not for himself alone but also as a 'private attorney general,' vindicating a policy that Congress considered of the highest importance." *Id.* at 575, 106 S.Ct. at 2694, 106 S.Ct. 2686 (quoting *Newman v. Piggie Park Enter., Inc.,* 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968)).

Plaintiffs' civil rights action resulted in a judicial pronouncement that the LSA's admissions policies were unconstitutional and therefore, as a result of their lawsuit, Defendants were required to alter those policies. Regardless of whether this change ever will benefit Gratz, Hamacher, or another specific class member, Plaintiffs achieved a result they pursued for the benefit of the public in general. Thus the Court concludes that Plaintiffs are "prevailing parties" as the Supreme Court has defined that term.

### "Reasonable" Attorneys' Fees

Section 1988 only allows a prevailing party to recover its "reasonable" attorneys' fees. 42 U.S.C. § 1988. As the legislative history to § 1988 provides, "a reasonable attorney's fee award 'is one that is adequate to attract competent counsel but ... [that does] not produce windfalls to attorneys.'" *Blum v. Stenson,* 465 U.S. 886, 893, 897, 104 S.Ct. 1541, 1546, 1548, 79 L.Ed.2d 891 (1984)(quoting S.Rep. No. 94–10011, p. 6 (1976), U.S.Code Cong. & Admin.News 1976, pp. 5908, 5913); *see*

also *Adcock–Ladd v. Sec'y of Treasury,* 227 F.3d 343, 349 (6th Cir.2000) (citations omitted).

■ The starting point for calculating a reasonable attorneys' fees award "should be the determination of the fee applicant's 'lodestar,' which is the proven number of hours reasonably expended on the case by an attorney, multiplied by his [or her] court-ascertained reasonable hourly rate." *Adcock–Ladd,* 227 F.3d at 349 (citing *Hensley,* 461 U.S. at 433, 103 S. Ct at 1939). "The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed. Where the documentation of hours is inadequate, the district court may reduce the award accordingly." *Hensley,* 461 U.S. at 433, 103 S.Ct. at 1939. The Supreme Court has instructed district courts to exclude fees that were not "reasonably expended," such as fees due to overstaffing or redundancy of work. *Id.* at 434, 103 S.Ct. at 1939.

■ Once the district court determines the fee applicant's lodestar, the court must consider other factors relevant to the reasonableness of any fee award.[2] One important factor is the "results obtained." *Hensley,* 461 U.S. at 434, 103 S.Ct. at 1940. As the Supreme Court has explained, there are two situations where the results obtained may affect the fee award:

> In some cases a plaintiff may present in one lawsuit distinctly different claims for relief that are based on different facts and legal theories. In such a suit ... counsel's work on one claim will be unre-

---

**2.** The factors identified by the Supreme Court are: (1) the time and labor required by a given case; (2) the novelty and difficulty of the questions presented; (3) the skill needed to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved

and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Hensley,* 461 U.S. at 430 n. 3, 103 S.Ct. at 1937 n. 3 (citing *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir.1974)).

lated to his work on another claim. Accordingly, work on an unsuccessful claim cannot be deemed to have been "expended in pursuit of the ultimate result achieved." ... The congressional intent to limit awards to prevailing parties requires that these unrelated claims be treated as if they had been raised in separate lawsuits, and therefore no fee may be awarded for services on the unsuccessful claim.

*Id.* at 434–35, 103 S.Ct. at 1940. The *Hensley* Court expressed doubt as to whether such claims will arise with frequency; rather, the Court explained, most civil rights cases will present only a single claim or multiple claims involving a common core of facts or based on related legal theories. In this second situation:

> Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead, the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.

*Id.* at 435, 103 S.Ct. at 1940. The Court explained that in this situation, if the plaintiff has obtained excellent results, his or her attorney should recover a fully compensatory fee. *Id.* "If, on the other hand, a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount." *Id.* at 436, 103 S. Ct at 1941. As the *Hensley* Court instructed, it is within the district court's discretion to attempt to identify specific hours that should be eliminated or to simply reduce the award to account for the limited success. *Id.* at 436–37, 103 S.Ct. at 1941.

## Limited Success

■ Defendants ask the Court to reduce any fee award because Plaintiffs only achieved partial or limited success. Specifically, Defendants argue that Plaintiffs' primary purpose in bringing their lawsuit was to invalidate the consideration of an applicant's race in college admissions decisions. As Defendants point out, this Court and the Supreme Court rejected Plaintiffs' argument that race is never a relevant and legitimate consideration in the admissions process.

While Plaintiffs now attempt to downplay the primacy of their argument that the use of racial preferences in undergraduate admissions always violates the Constitution, the Court agrees with Defendants that Plaintiffs' main goal in this litigation was to prevail on this issue. In fact, the Supreme Court specifically noted that this was Plaintiffs' "first and foremost" argument. *Gratz*, 539 U.S. at 268, 123 S.Ct. at 2426. The Court therefore finds it appropriate to reduce Plaintiffs' requested award to reflect that they failed to prevail on this issue.

The Court cannot possibly determine from Plaintiffs' billing statements the amount of hours expended on this issue as opposed to the "narrowly tailored" issue on which they prevailed. The Court therefore opts to reduce the hours expended by a percentage amount. In deciding what percentage amount is appropriate, the Court finds it significant that Plaintiffs' lawsuit took on historical significance primarily because they attempted to eliminate race as a permissible factor in undergraduate admissions. Thus the Court concludes that Plaintiffs' failure to prevail on this issue warrants a fifty percent (50%) reduction in the hours expended on this litigation.

## Vague Billing Entries and "Block Billing"

■ Defendants also seek a reduction in the number of hours expended by Plaintiffs' attorneys due to the vagueness of the attorneys' billing records. Defendants argue that vague and general entries such as, "telephone conference," "office conference," "research," and "review article" make it impossible for the Court to evaluate the reasonableness of the hours expended on the litigation. This Court agrees with respect to the billing entries submitted by the Maslon attorneys.

As the Court of Appeals for the District of Columbia Circuit has stated: "To establish that he is entitled to reimbursement for particular items of attorneys' fees ... the fee petitioner must provide the court with the attorneys' billing records that describe the work performed *in sufficient detail* to establish that the work is reasonably related [to the litigation]." *In re Samuel R. Pierce, Jr.*, 190 F.3d 586, 593–94 (D.C.Cir.1999) (citations omitted)(emphasis added). "[I]nadequate documentation 'makes it impossible for the court to verify the reasonableness of the billings, either as to the necessity of the particular service or the amount of time expended on a given task.'" *Id.* (quoting *In re Sealed Case*, 890 F.2d 451, 455 (D.C.Cir.1989) (*per curiam*)). Following the D.C. Circuit's general practice, the *In re Pierce* court reduced the hours billed by the plaintiff's attorneys by ten percent as a result of the attorney's vague entries. The Eighth Circuit has upheld a district court's reduction of the hours billed by a prevailing party's attorney by twenty percent (20%) for vague billing records. *See H.J. Inc. v. Flygt Corp.*, 925 F.2d 257, 260 (8th Cir. 1991).

Maslon's billing records contain numerous imprecise or incomplete entries. *See* Kolbo Aff. Ex. N. As Defendants point out, there are extensive records containing such limited descriptions as "office conference" (e.g. 12/2/97; 12/10/97; 12/15/97; 2/16/98; 2/18/98; 2/20/98; 3/10/98; 3/30/98); "telephone conference" (e.g. 10/12/97; 12/2/97); "review article" or "review correspondence" (e.g. 10/14/97; 12/3/97; 12/4/97; 12/13/97; 12/29/97; 2/16/98; 2/20/98; 3/7/98). Without further detail as to what was discussed and/or reviewed, the Court cannot determine whether the task was necessary for the litigation, whether the time expended on the task was reasonable, and whether the task was duplicated by other attorneys representing Plaintiffs.

Additionally, many of the Maslon attorneys' billing entries contain "block billing." For example, Mr. Kolbo's entry for 12/16/97 describes 10 hours of work to: "prepare for and attend pretrial with judge; meet with co-counsel; calls to CIR." Mr. Herr's entry for 4/8/98 describes 10 hours of work for: "conference with Kirk Kolbo; meet with local counsel; review discovery responses and court notes; attend pretrial conference; conferences with Kirk Kolbo." As a result of such "block billing," the Court is not able to determine the number of hours expended on each discrete task. Thus the Court cannot determine whether the number of hours billed are reasonable.

The Court believes that a ten percent (10%) reduction in Maslon's requested fees is appropriate due to its attorneys' block billing and vague entries.

### Fees Related to the Intervenors

■ Defendants object to a fee award that includes the hours Plaintiffs' attorneys expended litigating against the Intervenors. The Supreme Court has held that a prevailing party in a civil rights lawsuit cannot recover attorneys' fees from an intervenor who has not violated the law, unless the intervention is "frivolous, unreasonable or without foundation." *Indep.*

*Fed'n of Flight Attendants v. Zipes,* 491 U.S. 754, 761, 109 S.Ct. 2732, 2737, 105 L.Ed.2d 639 (1989). The Court, however, has not decided whether a prevailing party can recover such fees and costs from the defendant whose illegal conduct precipitated the intervention.

At least two circuit courts have interpreted *Zipes* as implying that the prevailing plaintiffs should bear the risk of incurring intervention-related costs as a result of filing a lawsuit and therefore have extended *Zipes* to a prevailing parties' request for intervention-related attorneys' fees from the losing defendant. *See, e.g., Rum Creek Coal Sales, Inc. v. Caperton,* 31 F.3d 169, 176–78 (4th Cir.1994); *Bigby v. City of Chicago,* 927 F.2d 1426, 1428–29 (7th Cir.1991). In a case similar to the one now before this Court, the Fifth Circuit upheld the district court's refusal to award intervention-related fees and costs from the defendant's pocket because the plaintiffs "did not 'prevail' on this issue vis-a-vís [the defendant]." *Hopwood v. Texas,* 236 F.3d 256, 280 (5th Cir.2000). As the court explained, "[the defendant] remained neutral on the intervention issue. In addition, the potential intervenors made clear . . . that the purpose of their intervention was to raise arguments and defenses that [the defendant] itself had no interest in raising." *Id.* The Fifth Circuit, however, declined to decide whether a prevailing party always should be barred from shifting to the defendant the costs associated with defending against an intervention. *Id.*

As in *Hopwood,* Defendants in the pending matter remained neutral on the intervention issue and the purpose of the intervention was to raise arguments and defenses that Defendants expressed no interest in raising. The Intervenors argued that the use of race as a factor in LSA's admissions process was necessary to remedy past discrimination by the University a justification the Supreme Court noted in its opinion the University has *never* asserted during this litigation. Because the Intervenors asserted a completely different defense to the University's admissions process, the Court also finds it likely that the intervention delayed the progress of the litigation. At the very least, the intervention resulted in attorneys' fees and costs that Plaintiffs otherwise would not have incurred. The Court therefore concludes that Plaintiffs are not entitled to attorneys' fees and costs related to the Intervenors.

The Court has conducted a thorough review of the billing records submitted by the Maslon attorneys and finds the following fees and costs related to the intervention and therefore excludable:

Mr. Richter = 54.8 hours

Mr. Herr = 68.3 hours

Mr. McCarthy = 42.2 hours

Mr. Purdy = 31.15 hours

Mr. Kolbo = 177.5 hours

Mr. Carlton = .5 hours

Ms. Dunbar = 2.5 hours

Ms. Engelstad = 2.4 hours

As to CIR:

Mr. Rosman = 38.3 hours

Mr. Bader = 7.3 hours

Mr. McDonald = .8 hours

### Fees Related to Public and Media Relations

■ Defendants ask the Court to exclude as unreasonable any attorneys' fees related to public and media relations efforts. Plaintiffs argue that such fees are reasonable for two reasons. First, Plaintiffs argue that in a highly publicized case such as this, it is important for attorneys to advise their clients in communicating with the media. Second, Plaintiffs argue that in a class action lawsuit involving a large class such as this, the media offers a

means of communicating with class members about the progress and status of the case.

Some courts have found fees related to press relations reimbursable to the extent the hours expended "were reasonably necessary for the proper prosecution of the lawsuit." *See, e.g., Keyes v. Sch. Dist. No. 1, Denver Colorado,* 439 F.Supp. 393, 408 (D.Colo.1977). In *Keyes,* a desegregation case involving the Denver, Colorado public school system, the court noted the difficulty counsel had in reaching some segments of the class, specifically members of the Hispanic population. *Id.* at 408. The court found that the news media provided a valuable conduit for information between counsel and those class members. *Id.* The court therefore held as reasonably necessary "only those discussions with the press that contributed to communication with the class in a *meaningful* way and were necessary for the prosecution of the suit." *Id.* (emphasis in original). Following *Keyes,* the District Court for the District of Utah awarded attorneys' fees related to media relations efforts in a civil rights lawsuit before it, *but only to the extent* that such compensation was for "meaningful communications necessary to the prosecution of the suit." *David C v. Leavitt,* 900 F.Supp. 1547, 1557–58 (D.Utah 1995).

As the *Leavitt* court recognized, however, a number of courts (including the District Court of Utah in a prior opinion) have found time spent communicating with the press and other news media noncompensable. *Id.* at 1557 (citing *Utah Int'l, Inc. v. Dep't of Interior,* 643 F.Supp. 810, 831 n. 41 (D.Utah 1986); *Jane L. v. Bangerter,* 828 F.Supp. 1544, 1550 (D.Utah 1993); and *Ramos v. Lamm,* 632 F.Supp. 376, 381 (D.Colo.1986)); *see also Greater Los Angeles Council on Deafness v. Cmty. Television of S. Cal.,* 813 F.2d 217, 221 (9th Cir.1987)(affirming denial of fees for time spent on publicity and lobbying);

*Hart v. Bourque,* 798 F.2d 519, 523 (1st Cir.1986)(affirming denial of fees for time "spent on arrangements for lectures or publications about the case"). The Third Circuit has held that compensation for work related to "publicity efforts" is not compensable, noting that "[t]he fact that private lawyers may perform tasks other than legal services for their clients, with their consent and approval, does not justify foisting off such expenses on an adversary under the guise of reimbursable fees." *Halderman v. Pennhurst State Sch. & Hosp.,* 49 F.3d 939, 942 (3d. Cir. 1995). The *Halderman* court relied on the Fourth Circuit's reasoning in *Rum Creek Coal Sales,* that "[t]he legitimate goals of litigation are almost always attained in the courtroom, not in the media." *Id.* (quoting *Rum Creek Coal Sales,* 31 F.3d at 176). This Court is persuaded by the reasoning of the Third and Fourth Circuits and concludes that Plaintiffs should not be compensated for the hours their attorneys expended on media and public relations efforts. *See also Hopwood v. Texas,* 999 F.Supp. 872, 912–13 (W.D.Tex.1998)(denying requests for fees related to public and media relations), *aff'd* 236 F.3d 256, 280–81 (5th Cir.2000). But even if the Court were to follow *Keyes,* the Court finds that Plaintiffs have not met their burden of showing that the hours billed by their attorneys for media and public relations efforts contributed in a meaningful way to the litigation. If the purpose of counsel's efforts was to prevent Plaintiffs from publicly saying something detrimental to their case or image, the Court cannot conclude that such advice was "necessary to the prosecution of the suit." Counsel simply could have advised their clients to avoid speaking to the media altogether. The fact that a plaintiff and/or his or her attorney decide to speak with the media does not mean the opposing party should bear the costs of those

efforts. Moreover, the Court finds it more likely in this case that the media and public relations efforts reflect an effort by both sides to sway public opinion in this extremely socially and politically divisive matter.

The Court finds the following hours related to media and public relations efforts excludable for the Maslon firm:

Mr. Herr = 22.9 hours

Mr. Purdy = 20.5 hours

Mr. Kolbo = 19.0 hours

Ms. Dunbar = 3 hours

Additionally, the Court will deduct $2,318.19 in expenses related to Mr. Purdy's trip to New York in November 2000, to meet with reporters from the Wall Street Journal and New York Times. As to CIR, the Court finds 6.5 hours billed by Mr. Rosman excludable.[3]

### Duplication of Efforts

If the prevailing party has not already done so, the Supreme Court has advised district courts to exclude from a fee request hours that are redundant, for example due to overstaffing. *Hensley*, 461 U.S. at 434, 103 S.Ct. at 1939. In the present matter, Plaintiffs were represented by at least sixteen lawyers in three different cities. While it appears that the Maslon and CIR attorneys have deleted some duplicative billing (for example, participation by more than one attorney at some hearings and depositions), a significant number of billing entries show multiple attorneys charging for the same tasks or for tasks only made necessary because of the large number of attorneys involved in the litigation. For example, many entries relate to

telephone conferences and meetings between the attorneys and to preparation of notes, e-mails, and memoranda for the sole purpose of keeping Plaintiffs' other attorneys apprised of progress in the case. In fact, a significant portion of the work performed by local counsel in this case represents unnecessary, redundant services.[4] "While there is nothing inherently unreasonable about making an award for time spent by two or more lawyers engaged in the same representation, counsel bears the burden of showing his or her specific contribution." *Childress v. Williams*, No. 97–72335 at 9 (E.D.Mich. July 12, 1999) (citing *Am. Civil Liberties Union of Georgia v. Barnes*, 168 F.3d 423, 432 (11th Cir.1999)). In this case, as in *Childress*, there often is no indication of the discrete contribution that each lawyer made when more than one lawyer engaged in the same task.

■ CIR enlisted the Maslon firm to litigate this action as Plaintiffs' primary attorneys. The Court therefore concludes that a reduction of the Maslon attorneys' hours only is appropriate where attorneys within the firm engaged in the same tasks and there is no indication of the specific contribution the various lawyers made with respect to that task beyond simply reviewing another attorney's work. The Court believes that a five percent (5%) reduction in the Maslon attorneys' hours fairly represents such duplicative services.

■ CIR, on the other hand, describes one of its primary responsibilities as finding talented co-counsel to take the leading role in litigating Plaintiffs' claims. Once CIR accomplished this task, the Court

---

**3.** Defendant notes additional entries in 1997 by CIR attorneys related to media relations, however, these entries refer to meetings and/or discussions regarding the "need to avoid pre-litigation publicity." *See, e.g.* Rosman Aff. Ex. E (9/9/97 and 9/10/97). While a significant amount of additional time was expended by CIR attorneys on media and public

relations matters, CIR already deducted those hours.

**4.** Because the Court finds a large portion of local counsels' hours excludable on this basis, it will discuss those hours in a separate section.

sees no reason why CIR's attorneys expended countless hours reviewing Maslon's work, reviewing documents submitted in the litigation that a Maslon attorney also reviewed and billed, and discussing the course of the litigation with the Maslon attorneys. The Court therefore Court concludes that a ten percent (10%) reduction in CIR's requested fees is appropriate due to duplicative efforts.

### Fees Related to Travel

Some courts completely disallow compensation for an attorney's travel time. Other courts allow compensation for such time, although some of those courts reduce the attorney's hourly rate for such time. The Court finds it equitable in this case, particularly because Plaintiffs were represented by two out-of-state law firms, to reimburse Plaintiffs' attorneys for *most* of their travel time but at fifty percent (50%) of their reasonable hourly rate.[5] As discussed below, the Court finds that some of the trips made by the attorneys in this case were unnecessary and it therefore will exclude the travel hours related to those trips completely.

Most of the hours billed for travel relate to the attorneys' trips to Detroit, Michigan for court hearings, meetings with Plaintiffs, and depositions. Additionally, Plaintiffs' attorneys traveled to San Diego and Sacramento, California and College Station, Texas to complete depositions. The Court finds the following number of hours for the Maslon attorneys attributable to such trips:

Mr. Kolbo = 46.6 hours

Mr. Herr = 42.2 hours

Mr. Purdy = 12.5 hours

The Court will award Plaintiffs fees for 50% of these billing hours.

The Maslon attorneys also made several trips to Washington, D.C. to meet with attorneys from CIR. Even if it was necessary for the attorneys from both firms to confer during the progress of the litigation, the Court does not believe that it was necessary for those meetings to take place in person. Moreover, putting aside the issue of whether this litigation required representation by so many well-qualified attorneys from two out-of-state firms, the Court sees no reason why Defendants should bear the additional costs incurred because those firms are located in different and distant cities. The Court also finds unreasonable the multiple trips some of the Maslon attorneys made to Washington, D.C. for moot court arguments prior to their argument before the Supreme Court.[6] Therefore, the Court will exclude the following hours billed by the attorneys for travel between Minneapolis and Washington, D.C. for such purposes:

Mr. Herr = 36.65 hours

---

5. Generally Plaintiffs' attorneys reported their travel time in block billing entries. The Court therefore has determined the time for a direct flight to the attorneys' destination and reduced that amount of time from the total hours billed in the block entry. While this approach does not account for travel time to and from the airport or in the airport terminal, the Court believes this to be a reasonable approach and probably the only possible approach other than reducing the time billed entirely.

6. Mr. Herr and Mr. Purdy made three trips to Washington, D.C. from mid-April to late March 2003 to engage in "mock arguments" prior to the oral argument before the Supreme Court (2/26/03; 3/12/03; and 3/23/03). While the Court recognizes the value of such mock arguments, the Court finds no reason why the Maslon attorneys could not have conducted some of those arguments in Minneapolis. The Court sees no reason why the Maslon attorneys could not locate well-qualified attorneys in their community capable of helping them prepare. The Court therefore will exclude the costs related to the first and second trips.

Mr. Purdy = 12.2 hours

Mr. Kolbo = 7.0 hours

The Court also will exclude the following costs related to those trips and, for the reasons set forth earlier, travel expenses related to the Intervenors:

| Date Charged | Description | Amount |
| --- | --- | --- |
| 8/19/98 | Mr. Kolbo in D.C. 8/15–18 | $438.56 |
| 1/15/99 | Mr. Kolbo & Mr. Herr re: 1/22/99 meeting with CIR | $1,126 |
| 5/27/99 | Mr. Herr & Mr. Kolbo re: intervenors' appeal | $1,181 |
| 4/12/00 | Mr. Kolbo & Mr. Purdy in D.C. 4/17–18 to meet with CIR | $2,741.90 |
| 7/13/00 | Mr. Kolbo to D.C. 7/12–13 | $397.45 |
| 4/26/01 | Mr. Kolbo in D.C. to meet at CIR with Dept. of Justice | $805.57 |
| 10/9/01 | Mr. Kolbo & Mr. Herr in D.C. to prepare for 6th Cir. oral argument | $1,338.68 |
| 10/15/01 | Mr. Kolbo's & Mr. Purdy's hotel expenses for D.C. trip | $1,197.85 |
| 12/31/01 | Mr. Herr's misc. charges for D.C. trip | $56.14 |
| 3/11/03 | Mr. Kolbo to D.C. 3/12–13 to prepare for oral argument | $655 |
| 3/13/03 | Mr. Herr to D.C. re: same | $524.50 |
| 3/13/03 | Mr. Kolbo's airfare to D.C. on 2/24–27 re: same | $388.75 |
| 3/14/03 | Mr. Purdy's airfare to D.C. for same | $701.07 |
| 3/14/03 | Mr. Herr's misc. expenses in D.C. from 3/12–13 | $229.78 |

**Total: $11,782.25**

Finally, Plaintiffs include expenses related to a trip Mr. Purdy took to Simi Valley, California from June 27–29, 2001. However, neither Plaintiffs' billing records nor the chronology of events provided in Exhibit Q to Plaintiffs' motion explain the purpose of this trip. As the Court there-fore cannot determine whether these expenses were necessary, it will exclude the $785.06 billed for Mr. Purdy's trip.

**Miscellaneous Hours and Expenses**

The attorneys from CIR additionally billed a number of hours related to "local counsel issues" and "potential plaintiffs." The Court finds these hours unreasonable. As to the first category of hours, the Court does not believe that Defendants should incur the extra costs associated with Plaintiffs' representation by out-of-town counsel (e.g. travel related costs) *and* the fees incurred by out-of-town counsel in order to search for appropriate local counsel. As to the second category of hours, the Court does not believe that § 1988 contemplates an award of fees related to an attorneys' search for clients who will serve as model plaintiffs. The Court finds the following hours related to these categories and therefore will exclude them for the CIR attorneys:

Mr. Rosman = 1.8 hours

Mr. Troy = 11.2 hours

Mr. McDonald = 3.7 hours

Mr. Healy = 4.5 hours

Mr. Bader = 4.15 hours

While the Court has not excluded the hours attorneys billed for time spent reading books on affirmative action, the Court finds it unreasonable to bill Defendants for the purchase of those books. Defendants should not bear the costs for Plaintiffs' attorneys to stock their libraries. Similarly, while the Court finds the hours Plaintiffs' attorneys expended preparing for oral argument before the Supreme Court reasonable, the Court does not find it reasonable to bill Defendants for the costs of compact discs containing the Supreme Court's "greatest hits." The Court therefore will exclude $126.94 from the costs sought by CIR, consisting of the following:

| Date charged | Description | Amount |
|---|---|---|
| 11/11/99 | purchase of various publications | $49.40 |
| 2/14/00 | book purchase | $18.13 |
| 6/4/01 | book purchase | $14.93 |
| 2/18/03 | book purchase | $24.50 |
| 2/21/03 | 1/2 cost (other 1/2 to Grutter) for compact discs containing Supreme Court arguments | $19.98 |

■ Next, Plaintiffs' seek reimbursement for $277,858.92 in costs incurred during the course of this litigation. $3,947.76 of this amount represents costs incurred by Maslon for which it has not been reimbursed by CIR. $273,836.08 represents costs sought by CIR. According to Mr. Rosman's affidavit, this amount includes approximately $115,000 CIR reimbursed Maslon for the latter's costs. $15,928.54 of this amount is attributable to Westlaw expenses, an amount the Court finds exorbitant. The Court will reduce this latter amount by twenty-five percent (25%) or by $3,982.14. The Court also will deduct the $14,676 the Supreme Court already awarded to Plaintiffs for costs which they include in their current request for reimbursement.[7]

## Local Counsel

Having reviewed Mr. Wright's and Mr. Morgan's billing entries, the Court finds it difficult to identify what use local counsel served in this case other than to increase the number of duplicative hours expended on this litigation. This is not necessarily the fault of Mr. Wright or Mr. Morgan. More likely it is due to the fact that Plaintiffs were represented by at least fifteen other well-qualified lawyers who primarily handled 100% of the litigation.

■ Mr. Wright actually expended fewer hours duplicating the work of the Maslon and/or CIR attorneys than Mr. Morgan. The Court finds, however, that a number of tasks completed by Mr. Wright could have been performed by non-legal staff (e.g. calling the University to obtain the names of its officers, president and the various deans of the LS & A and their dates of service (10/2/97; 10/7/97; 10/9/97)). A large percentage of Mr. Wright's billing entries also appear to relate to the filing of "a new complaint," presumably in *Grutter*. Having reviewed Mr. Wright's billing records and deleting such hours, the Court finds 36.8 hours reasonably expended in this litigation. With respect to Mr. Wright's expenses, the Court will exclude $484.20, representing $28.94 billed for purchasing a copy of "Diversity Machine" and the mileage to the bookstore and $455.26 for the purchase of a facsimile machine and attachment cable. These reductions will be reflected in the final fees and costs awarded to Plaintiffs for CIR.

Most of Mr. Morgan's billing entries reflect time spent "receiving and reviewing" materials that also were received and reviewed by the Maslon and CIR attorneys. While Mr. Morgan did attend a handful of depositions, those depositions were taken or defended by other attorneys in the case. Of the 323.50 hours billed by Mr. Morgan, the Court identified only 55 hours where Mr. Morgan did more than review filings, pleadings, documents, drafts, letters etc... The Court finds the costs sought by Mr. Morgan to be reasonable.

## Reasonable Hourly Rate[8]

To calculate the "reasonable hourly

---

7. While Plaintiffs indicate that Defendants have not yet paid this sum, the Court is confident that Defendants will comply with the Supreme Court's order.

8. Rather than seeking interest on their attorneys' fees, Plaintiffs seek reimbursement for all hours at a 2004 hourly rate. The Supreme Court has approved this practice as a method to compensate for any delay in payment. *See*

rate" component of the lodestar calculation, the Supreme Court has instructed district courts to assess the "prevailing market rate in the relevant community." *Blum*, 465 U.S. at 895, 104 S.Ct. at 1547. Where a party has selected out-of-town attorneys, the Sixth Circuit has defined the reasonable hourly rate as follows:

> ... when a counselor has voluntarily agreed to represent a plaintiff in an out-of-town lawsuit, thereby necessitating litigation by that lawyer primarily in the alien locale of the court in which the case is pending, the court should deem the "relevant community" for fee purposes to constitute the legal community within that court's territorial jurisdiction; thus the "prevailing market rate" is that rate which lawyers of comparable skill and experience can reasonably expect to command within the venue of the court of record, rather than foreign counsel's typical charge for work performed within a geographical area wherein he maintains his [or her] office and/or normally practices, at least where the lawyer's reasonable "home" rate exceeds the reasonable "local" charge.

*Adcock–Ladd*, 227 F.3d at 350 (citing *Hudson v. Reno*, 130 F.3d 1193, 1208 (6th Cir.1997)). Based on the above, the Court rejects Plaintiffs' argument that the rates sought by the CIR attorneys are reasonable based on rates for Washington, D.C. law firms published in the *Laffey Matrix*.

Plaintiffs seek the following hourly rates for the Maslon attorneys and paralegals:

Mr. Kolbo = $325
Mr. Herr = $390
Mr. Purdy = $375
Mr. McCarthy = $275
Mr. Richter = $210
Mr. Lien = $215
Ms. Van Tassel = $210
Mr. Carlton = $220

Ms. Dunbar, Mr. Bazdell, and Ms.
Engelstad = $150

Mr. Kolbo is a partner at the Maslon firm who has practiced law principally in the area of civil litigation for approximately twenty years. Mr. Herr, also a Maslon partner, practices in the firm's litigation and appellate practice. Mr. Herr obtained his juris doctorate ("JD") in 1978. Mr. Purdy obtained his JD in 1977 and is a partner focusing on litigation. Mr. McCarthy, who obtained his JD in 1992, is a partner with a general litigation and appellate practice. Mr. Richter worked as a law clerk at the Maslon firm until he obtained his JD in 1999. He now is an associate in Maslon's litigation and appellate practice. Mr. Lien and Ms. Van Tassel obtained their JDs in 1998 and 1999, respectively, and have since practiced in Maslon's litigation practice. Mr. Carlton, who obtained his JD in 1996, was associated with Maslon from August 1998 through June 2000. Ms. Dunbar, Mr. Bazdell, and Ms. Engelstad are paralegals, each with a number of years of experience.

Plaintiffs seek the following hourly rates for the CIR attorneys:

Mr. Rosman = $335
Mr. McDonald = $380
Mr. James Wright = $380
Mr. Casale = $335
Mr. Troy = $335
Mr. Bader = $270
Mr. Krvaric = $220
Student Attorneys = $105

Mr. Rosman graduated Yale University's law school in 1984 and began working at CIR in 1994. Mr. McDonald, one of CIR's founders and the former director of its litigation section, obtained his JD in 1981. Mr. Wright, senior counsel at CIR, obtained his JD in 1972. Mr. Casale, Mr.

*Missouri v. Jenkins*, 491 U.S. 274, 284, 109 S.Ct. 2463, 2469, 105 L.Ed.2d 229 (1989).

Troy, and Mr. Bader, each holding the title of associate general counsel for CIR, graduated law school in 1988, 1992, and 1994, respectively. Mr. Krvaric graduated law school in 2000.

CIR has billed local counsel Patrick Wright's time at an hourly rate of $125, with a monthly maximum of $1250. Mr. Morgan seeks reimbursement at an hourly rate of $270. Mr. Morgan obtained his JD in 1980 and has practiced in the area of civil litigation since then.

Plaintiffs claim that the rates sought for their attorneys is in line with the prevailing rates of lawyers of comparable skill, knowledge, qualifications, experience, and reputation in the Detroit metropolitan area. They provide the affidavit of Mark Kowalsky, a partner at the law firm of Hertz, Schram & Saretsky in Bloomfield Hills, Michigan, who states that the rates sought by Plaintiffs' attorneys are reasonable in comparison with prevailing market rates. *See* Kowalsky Aff. ¶ 7. Plaintiffs seek to further support these rates with records obtained from the University through the Freedom of Information Act ("FOIA") and with the hourly rates charged by some of Defendants' attorneys as published on Butzel Long's website. The FOIA records Plaintiffs offer indicate that the University has spent more than $10 million defending Plaintiffs' lawsuit and the lawsuit in *Grutter*. Additionally, Plaintiffs have sought discovery from Defendants with respect to the rates they were charged by their attorneys' and the attorneys' billing records. Plaintiffs hope to demonstrate through the information sought in their discovery requests that their attorneys' fees and costs are in-line with or less than those incurred by Defen-

dants in this litigation and therefore are reasonable.[9]

Defendants argue that the hourly rates charged by Plaintiffs' attorneys are unreasonable in comparison to civil rights attorneys with comparable skill and experience in the forum market. Defendants rely on the most recent *Economics of Practice* survey issued by the State Bar of Michigan, reporting 2003 hourly rates. According to the survey, attorneys at the largest firms (over 100 lawyers) in the Detroit metropolitan area charge an average hourly rate of $241. The survey further reports a 95th percentile rate of $358. For attorneys, state-wide, with forty or more years of experience, the survey reports an average rate of $188. Defendants note that Plaintiffs seek rates higher than $188 *for all of their Maslon attorneys,* including a 1998 law school graduate. Defendants further note that none of the Maslon attorneys demonstrate any particular expertise in civil rights litigation.

 As an initial matter, the Court finds the hourly rates charged by Defendants' attorneys and the hours those attorneys expended defending against Plaintiffs' lawsuit of no particular value to its determination of Plaintiffs' fees award. As Defendants point out, a party seeking attorneys' fees pursuant to § 1988 must support their request with sufficiently detailed records to demonstrate the reasonableness of their fees. If the Court cannot determine the reasonableness of the attorneys' fees based on those billing records without reference to the opposing party's records, the party seeking fees has not met its burden under § 1988. More importantly, § 1988 only guarantees civil rights plaintiffs "competent counsel," whereas a party

---

**9.** Defendants have refused to comply with Plaintiffs' discovery requests and, as a result, Plaintiffs filed a motion to allow limited discovery related to fees and costs on October 21, 2004. For the reasons set forth infra, the Court is denying Plaintiffs' motion to compel discovery.

defending against such a suit may be willing and able to pay top dollar to hire the best lawyers in the country. Similarly, an opposing party's *willingness* to pay its lawyers to perform certain tasks (or perhaps a lawyer's billing for certain tasks which the client may refuse to pay) does not render the same tasks by the prevailing party's attorneys reasonable.

In any event, Defendants provide the following information with respect to the 2003 hourly rate charged by two of their lead attorneys who practice in the prevailing market. Philip Kessler, a shareholder in the law firm of Butzel Long and President of the firm, charged Defendant $230 per hour for his time on this case and the *Grutter* litigation. *See* Defs.' Supp. Opp. to Pls.' Mot., Ex. 2 ¶¶ 2 & 6. Mr. Kessler has practiced law since 1972. *See id.* Att. Leonard Niehoff, also a Butzel Long shareholder, charged Defendant $195 per hour for his time on the two cases. *See id.* ¶¶ 1 & 5 Mr Niehoff has substantial experience in litigation, particularly cases involving civil rights and constitutional issues. *See id.*

As Defendants note, *all* of the hourly rates Plaintiffs seek to recover for their attorneys exceed Mr. Niehoff's hourly billing rate. This includes the rates sought for five attorneys who only graduated law school *during* this litigation (Mr. Richter 1999; Mr. Lien 1998; Ms. Van Tassel 1999; Mr. Casale 1998; and Mr. Krvaric 2000) and the rates sought for two attorneys who graduated less than five years before the litigation began (Mr. Carlton 1996 and Mr. Bader 1994). None of the Maslon attorneys demonstrate particular expertise in civil rights or constitutional

law issues. The Court therefore does not find Mr. Kessler's or Mr. Niehoff's hourly billing rates helpful to its assessment of the reasonableness of the rates sought by Plaintiffs' attorneys.

Instead, the Court will begin by looking at the rates reported in the State Bar's survey to determine the prevailing market rate applicable to this case. For each of Plaintiffs' attorneys, the Court has determined the prevailing market rate for attorneys with similar legal classifications, years of experience, and fields of law and in comparably-sized practice groups.[10] Because the Bar's survey reports state-wide rates for these categories, for out-of-town counsel the Court has increased those rates by the percentage difference between the average rate for attorneys practicing in Detroit and the average rate for attorneys practicing state-wide (43%).[11] The Court also factored in the average hourly billing rate for attorneys in the Detroit metropolitan area. The Court used the average billing rate set forth in the survey for attorneys in the above categories (rather than a higher percentile) as § 1988 only guarantees Plaintiffs competent counsel, not the best and/or most expensive counsel. With respect to the student attorneys who worked on this case for CIR, the Court found the billing rates of paralegals with five or less years experience and new hires in Detroit with no experience as an equitable basis for determining their appropriate billing rates.

Next, the Court considered the factors set forth in *Johnson*. With respect to CIR's lead attorneys (Mr. Rosman, Mr. McDonald, and Mr. Wright), the Court

---

**10.** As CIR did not indicate the size of its practice, the Court did not consider this factor in determining a reasonable rate for its attorneys.

**11.** According to Exhibit 23 of the survey, the average hourly billing rate for attorneys with

offices outside Detroit is $166.55. The average hourly rate for attorneys with offices in Detroit is $238. *See id.* Therefore, the average rate for Detroit-based attorneys is 43% above the average rate for all other Michigan lawyers.

finds that it is appropriate to increase their rates by approximately 10% to reflect their experience handling civil rights and constitutional law cases. *See infra* n. 13. The Court does not believe that an increase in Plaintiffs' fees is warranted by any of the other *Johnson* factors. This was not a particularly complex or novel case. As the Fifth Circuit stated in *Hopwood,* a case involving identical legal issues:

> The issues presented by this case may well provide grist for the political and legal mills, but they are "neither novel nor extraordinarily difficult." The underlying arguments about the place of affirmative action in the equal protection paradigm have been percolating since the Supreme Court's decision in *Bakke* if not longer, only the evidence and analysis supporting each side have grown more sophisticated over the past two decades. Stated differently, this is not an issue that demanded a large amount of legal excavation in this instance.

*Hopwood,* 236 F.3d at 279. For that reason, the case did not demand unusual skill and while the case required an expenditure of a significant amount of time, because of the number of attorneys representing Plaintiffs, the Court cannot believe the case precluded any attorney from other employment.

 Based on the above, the Court finds the following prevailing market rates to be reasonable rates for Plaintiffs' attorneys:

12. In reaching this amount the Court considered the following:

 a) the average rate for partners state-wide = $210 + ($210 × 43%) = $300.30

 b) the average rate for attorneys w/20 years of more experience = $188 + ($188 × 43%) = $268.84

 c) the average rate for attorneys in firms w/more than 100 attorneys = $241 + ($241 × 43%) = $344.63

Mr. Kolbo, Mr. Herr, Mr. Purdy = $280 [12]

Mr. McCarthy = $275

Mr. Richter, Mr. Lien, Ms. Van Tassel, & Mr. Carlton = $230

Mr. Rosman, Mr. McDonald, & Mr. Wright = $290 [13]

Mr. Casale, Mr. Troy, Mr. Bader, & Mr. Krvaric = $200

Mr. Morgan = $188

As the Court has found the prevailing market rate for attorneys comparable to Mr. Richter, Mr. Lien, Ms. Van Tassel, and Mr. Carlton to be higher than the actual rates billed for those attorneys' time, the Court finds the rates sought to be reasonable and will apply those rates in calculating Plaintiffs' award. With respect to Maslon's paralegals, the Court finds an hourly rate of $100 reasonable based on the State Bar of Michigan survey. The survey also indicates that Patrick Wright's $125 hourly rate is reasonable.

### Summary as to Fees

In summary, for the Maslon attorneys and paralegals, the Court will exclude the following billable hours and fees charged for those hours:

#### *Excessive Hours*

| Name | Intervenors (p.18–19) | Media/ Public Relations (p.22) | Travel (p.25–26) | Total |
|---|---|---|---|---|
| Mr. Kolbo | 177.5 | 19 | 30.3 | 226.8 |
| Mr. Herr | 68.3 | 22.9 | 57.75 | 148.95 |

 d) the average rate for attorneys in the field of litigation (not personal injury) = $176 + ($176 × 43%) = $251.68

 e) the average rate for attorneys practicing in downtown Detroit = $238

13. The prevailing market rate for Mr. Rosman and Mr. McDonald is $265 and for Mr. Wright, $262. The Court finds a 10% increase to $290 reasonable in light of their experience in the areas of civil rights and constitutional law. *See supra* at p. 949.

| | | | |
|---|---|---|---|
| Mr. Purdy | 31.15 | 20.5 | 18.45 | 70.1 |
| Ms. Dunbar | 2.5 | 3 | | 5.5 |
| Ms. Englestad | 2.4 | | | 2.4 |
| Mr. Richter | 54.8 | | | 54.8 |
| Mr. Carlton | .5 | | | |

### Fees Deducted Due to Excessive Hours

| Name | Total Unreasonable Hours | Rate Charged | Total |
|---|---|---|---|
| Mr. Kolbo | 226.80 | $325 | $73,710 |
| Mr. Herr | 148.95 | $390 | $58,090.50 |
| Mr. Purdy | 70.10 | $375 | $26,287.50 |
| Ms. Dunbar | 5.5 | $150 | $825 |
| Ms. Englestad | 2.4 | $150 | $360 |
| Mr. Richter | 54.8 | $210 | $11,508 |
| Mr. McCarthy | 42.2 | $275 | $11,605 |
| Mr. Carlton | .5 | $220 | $110 |

### TOTAL $182,496

For the Maslon attorneys and paralegals for whom Plaintiffs requested unreasonable hourly rates, the Court finds that they billed the following total number of reasonable hours in this litigation (i.e. total hours billed minus the above unreasonable hours):

| Name | Total Hours | Total Unreasonable Hours | Total Reasonable Hours |
|---|---|---|---|
| Mr. Kolbo | 2,180.50 | 226.8 | 1953.70 |
| Mr. Herr | 967.20 | 148.95 | 818.25 |
| Mr. Purdy | 459.10 | 70.1 | 389 |
| Ms. Dunbar | 55.1 | 5.5 | 49.6 |
| Ms. Englestad | 36.4 | 2.4 | 34 |
| Mr. Bazdell | 119.60 | 0 | 119.60 |

The fees *charged* for these hours are as follows:

| Name | Reasonable Hours | Rate Charged | Fees Charged |
|---|---|---|---|
| Mr. Kolbo | 1953.7 | $325 | $634,952.50 |
| Mr. Herr | 818.25 | $390 | $319,117.50 |
| Mr. Purdy | 89 | $375 | $145,875 |
| Ms. Dunbar | 49.6 | $150 | $7,440 |
| Ms. Engelstad | 34 | $150 | $5,100 |
| Mr. Bazdell | 119.60 | $150 | $17,940 |

### TOTAL $1,130,425

The fees to which Plaintiffs *are entitled* for these Maslon hours based on a reasonable rate, are as follows:

| Name | Reasonable Hours | Reasonable Rate | Reasonable Fees |
|---|---|---|---|
| Mr. Kolbo | 1953.7 | $280 | $547,036 |
| Mr. Herr | 818.25 | $280 | $229,110 |
| Mr. Purdy | 389 | $280 | $108,920 |
| Ms. Dunbar | 49.6 | $100 | $4,960 |
| Ms. Engelstad | 34 | $100 | $3,400 |
| Mr. Bazdell | 119.60 | $100 | $11,960 |

### TOTAL $905,386

### FEES DEDUCTED REPRESENTING DIFFERENCE BETWEEN FEES CHARGED AT UNREASONABLE RATES AND FEES ENTITLED TO AT REASONABLE RATES:

### $225,039

For the CIR attorneys, the Court will exclude the following billable hours and fees charged for those hours:

### Excessive Hours

| Name | Intervenors (p.18–19) | Media/ Public Relations (p.22) | Misc. Hours (p. 25–26) | Total |
|---|---|---|---|---|
| Mr. Rosman | 38.3 | 6.5 | 1.8 | 46.6 |
| Mr. Bader | 7.3 | | 4.15 | 11.45 |
| Mr. McDonald | .8 | | 3.7 | 4.5 |
| Mr. Troy | | | 11.2 | 11.2 |
| Mr. Healy | | | 4.5 | 4.5 |
| Mr. P. Wright | | | | 8.54 |

### Fees Deducted Due to Excessive Hours

| Name | Total Unreasonable Hours | Rate Charged | Total |
|---|---|---|---|
| Mr. Rosman | 46.6 | $335 | $15,611 |
| Mr. Bader | 11.45 | $270 | $3,091.50 |
| Mr. McDonald | 4.5 | $380 | $1,710 |
| Mr. Troy | 11.2 | $335 | $3,752 |
| Mr. Healy | 4.5 | $70 | $315 |
| Mr. P. Wright | 8.54 | $125 | $1,067.50 |

### TOTAL $25,547

For the CIR attorneys for whom Plaintiffs requested unreasonable hourly rates, the Court finds that they billed the following total number of reasonable hours in this litigation (i.e. total hours billed minus the above unreasonable hours):

| Name | Total Hours | Total Unreasonable Hours | Total Reasonable Hours |
|------|------|------|------|
| Mr. Rosman | 544.80 | 46.6 | 498.2 |
| Mr. Bader | 76.05 | | 76.05 |
| Mr. McDonald | 18.55 | 4.5 | 14.05 |
| Mr. Troy | 50.80 | 11.2 | 39.6 |
| Mr. Casale | 3.5 | | 3.5 |
| Mr. J. Wright | 29.97 | | 29.97 |
| Mr. Kvaric | 7.7 | | 7.7 |

The fees *charged* for these hours are as follows:

| Name | Reasonable Hours | Rate Charged | Fees Charged |
|------|------|------|------|
| Mr. Rosman | 498.2 | $335 | $166,897 |
| Mr. Bader | 76.05 | $270 | $20,533.50 |
| Mr. McDonald | 14.05 | $380 | $5,339 |
| Mr. Troy | 39.6 | $335 | $13,226 |
| Mr. Casale | 3.5 | $335 | $1,172.50 |
| Mr. J. Wright | 29.97 | $380 | $11,388.60 |
| Mr. Kvaric | 7.7 | $220 | $1,694 |

**TOTAL $220,250.60**

The fees to which Plaintiffs *are entitled* for these CIR hours based on a reasonable rate, are as follows:

| Name | Reasonable Hours | Reasonable Rate | Reasonable Fees |
|------|------|------|------|
| Mr. Rosman | 498.2 | $290 | $144,478 |
| Mr. Bader | 76.05 | $200 | $15,210 |
| Mr. McDonald | 14.05 | $290 | $4,074.50 |
| Mr. Troy | 39.6 | $200 | $7,920 |
| Mr. Casale | 3.5 | $200 | $700 |
| Mr. J. Wright | 29.97 | $290 | $8,691.30 |
| Mr. Kvaric | 7.7 | $200 | $1,540 |

**TOTAL $182,613.80**

*FEES DEDUCTED REPRESENTING DIFFERENCE BETWEEN FEES CHARGED AT UNREASONABLE RATES AND FEES ENTITLED TO AT REASONABLE RATES:*

**$37,636.80**

Deducting the above amounts reduces Maslon's fee award to $990,585.25 ($1,398,120.25—$407,535) and CIR's fee award to $191,046.95 ($254,230.75—$63,183.80). As the Court indicated, a further reduction of 65% ($643,880.41) is appropriate with respect to Maslon's hours and 60% ($114,628.17) with respect to CIR's hours to reflect Plaintiffs' limited success and the duplication of services, vague billing entries, and block billing entries by Plaintiffs' attorneys. *See supra* at 938–40 & 941–43.

### Computation
#### Maslon

| | |
|---|---|
| Total Fees Requested | $1,398,120.25 |
| Less: | |
| Fees charged for excessive hours | ($182,496) |
| Fees charged at unreasonable rates | ($225,039) |
| Sub–Total | $990,585.25 |
| Less 65% ($990,585 × 65%) | ($643,880.41) |

| **TOTAL FEES** | **$346,704.84** |
|---|---|

#### CIR

| | |
|---|---|
| Total Fees Requested | $254,230.75 |
| Less: | |
| Fees charged for excessive hours | ($25,547) |
| Fees charged at unreasonable rates | ($37,636.80) |
| Sub–Total | $191,046.95 |
| Less 60% ($191,046.95 × 60%) | ($114,628.17) |

| **TOTAL FEES** | **$76,418.78** |
|---|---|

The Court therefore finds a reasonable attorneys' fees award for the Maslon law firm of $346,704.84 and for CIR of $76,418.78.

With respect to Mr. Morgan, the Court calculates 55 reasonable hours expended by him at an hourly rate of $188, reduced by 50%, to reach a fee award of $5,170.

### Summary as to Costs

Finally, the Court has determined that the following expenses should be deducted from the $273,836.08 in expenses sought by CIR:

| Description | Amount | Page(s) Discussed |
|------|------|------|
| Mr. Purdy's trip expenses to New York in November 2000 for media relations | $2,318.19 | 22 |
| Maslon attorneys trips to D.C. to meet with CIR attorneys and for excessive moot court arguments and travel related to intervenors | $11,782.25 | 25–27 |
| Mr. Purdy's trip to Simi Valley, CA from June 27–29, 2001 | $785.06 | 27 |
| Book purchases | $126.94 | 29 |
| Deductions for exorbitant Westlaw costs | $3,982.14 | 29 |
| Costs already awarded by Supreme Court | $14,676 | 29 |
| Mr. P. Wright's unreasonable costs | $484.20 | 30 |

**TOTAL: $34,154.78**

Therefore the Court concludes that CIR is entitled to expenses totaling $239,681.30. Plaintiffs have not convinced the Court that they are entitled to interest on those expenses.

The Court will grant Mr. Morgan's request for $75.08 in expenses and Maslon's request for $3,947.75 in costs.

An Order consistent with this Opinion shall issue.

*ORDER GRANTING IN PART AND DE-NYING IN PART PLAINTIFFS' MOTION FOR AN AWARD OF ATTORNEYS' FEES AND COSTS PURSUANT TO 42 U.S.C. § 1988 AND DENYING PLAINTIFFS' MOTION TO ALLOW LIMITED DISCOVERY RELATED TO FEES AND COSTS*

On October 14, 1997, Plaintiffs filed this class-action lawsuit challenging the admissions policy of the University of Michigan's College of Literature, Science, and the Arts. Presently before the Court is Plaintiffs' motion for an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988. For the reasons set forth in an Opinion issued on this date,

**IT IS ORDERED**, that Plaintiffs' Motion for an Award of Attorneys' Fees and Costs Pursuant to 42 U.S.C. § 1988 is **GRANTED IN PART AND DENIED IN PART**;

**IT IS FURTHER ORDERED**, that Defendants shall pay Plaintiffs the Maslon law firm's attorneys' fees in the amount of $346,704.84 and costs in the amount of $3,947.75;

**IT IS FURTHER ORDERED**, that Defendants shall pay Plaintiffs the attorneys' fees of CIR (which includes fees for Patrick Wright) in the amount of $76,418.78 and costs in the amount of $239,681.30;

**IT IS FURTHER ORDERED**, that Defendants shall pay Plaintiff Kerry Morgan's attorney's fees in the amount of $5,170 and costs in the amount of $75.08;

**IT IS FURTHER ORDERED**, that Plaintiffs' Motion to Allow Limited Discovery Related to Fees and Costs is **DENIED**.